No. 22-40728

# In the
# United States Court of Appeals
# for the Fifth Circuit

---

LISA TORREY, ET AL.,

*Plaintiffs-Appellants,*

v.

INFECTIOUS DISEASES SOCIETY OF AMERICA,

*Defendant-Appellee.*

---

On Appeal from United States District Court
For the Eastern District of Texas, Texarkana Division
Civil Action No. 5:17-cv-190-RWS

---

## BRIEF FOR APPELLANTS

---

Daniel R. Dutko
Kendall Valenti Speer
RUSTY HARDIN & ASSOCIATES, L.L.P.
5 Houston Center
1401 McKinney Street, Suite 2250
Houston, Texas 77010
(713) 652-9000 Phone
ddutko@rustyhardin.com
kspeer@rustyhardin.com

**COUNSEL FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### PLAINTIFFS-APPELLANTS:

LISA TORREY

KATHRYN KOCUREK, Individually & On behalf of the Estate of J. DAVID KOCUREK, PH.D.

AMY HANNEKEN

JANE POWELL

CAROL FISCH

JOHN VALERIO, Individually and as Next Friend of Christopher Valerio

RANDY SYKES

BRIENNA REED

ROSETTA FULLER

ADRIANA MONTEIRO MOREIRA

JESSICA MCKINNIE

KRISTINE WOODARD

GAYLE CLARKE

ALLISON LYNN CARUANA

CHLOE LOHMEYER

TAWNYA DAWN SMITH, Individually and as Next Friend of MONET PITRE

MIKE PEACHER, Individually and as Next Friend of ASHLEIGH PEACHER

ALARIE BOWERMAN, Individually and as Next Friend of ELISA BOWERMAN, EMORY BOWERMAN, and ANAIS BOWERMAN

**PLAINTIFFS-APPELLANTS' APPELLATE COUNSEL:**

DANIEL R. DUTKO
KENDALL VALENTI SPEER
RUSTY HARDIN & ASSOCIATES, LLP
1401 McKinney St., Suite 2250
Houston, Texas 77010
(713) 652-9000 phone
(713) 652-9800 fax
ddukto@rustyhardin.com
kspeer@rustyhardin.com

**PLAINTIFFS-APPELLANTS' COUNSEL AT TRIAL COURT:**

DANIEL R. DUTKO
RYAN HIGGINS
RUSTY HARDIN & ASSOCIATES, LLP
1401 McKinney St., Suite 2250
Houston, Texas 77010
(713) 652-9000 phone
(713) 652-9800 fax
ddukto@rustyhardin.com
rhiggins@rustyhardin.com

EUGENE EGDORF
DANIELS & TREDENNICK, PLLC
6363 Woodway, Suite 700
Houston, TX 77057
(713) 917-0024 phone
(713) 917-0026 fax
eugene.egdorf@dtlawyers.com

LANCE LEE
5511 Plaza Drive
Texarkana, Texas 75503
(903) 223-0276 phone
(903) 223-0210 fax
wlancelee@gmail.com

**DEFENDANT-APPELLEE:**

INFECTIOUS DISEASES SOCIETY OF AMERICA

**DEFENDANT-APPELLEE'S APPELLATE COUNSEL:**

Alvin Dunn
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8355 phone
(202) 354-5442
alvin.dunn@pillsburylaw.com

**DEFENDANT-APPELLEE'S TRIAL COURT COUNSEL:**

Alvin Dunn
Michael A. Warley
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8355 phone
(202) 354-5442 fax
alvin.dunn@pillsburylaw.com
michael.warley@pillsburylaw.com

Ronald Casey Low
PILLSBURY WINTHROP SHAW PITTMAN LLP
401 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 580-9616 phone
(512) 580-9601 fax
casey.low@pillsburylaw.com

**TRIAL COURT JUDGE:**

Hon. Robert W. Schroeder, III
United States Courthouse and Post Office
500 North State Line Avenue, Third Floor
Texarkana, Texas 75501
(903) 794-4067 phone
(903) 794-1224 Fax

**MEDIATOR:**

Hon. David Folsom (Ret.)
JACKSON WALKER LLP
6002-B Summerfield Drive
Texarkana, Texas 75593
(903) 255-3251 phone
(903) 255-3266
dfolsom@jw.com

**GUARDIAN AD LITEM:**

George Matteson
MOORE, GILES & MATTESON, LLP
1206 Stateline Avenue
Texarkana, Arkansas 71854
(870) 774-5191phone
(870) 773-1102
george@mgmlawllp.com

By:   /s/ *Daniel R. Dutko*
      Daniel R. Dutko

TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PARTIES…………….…..……………… ii

TABLE OF CONTENTS…………………………………………. vi

TABLE OF AUTHORITIES……………………………….…………… ix

STATEMENT REGARDING ORAL ARGUMENT……………………….…. 1

INTRODUCTION……………………………………………. 1

STATEMENT OF JURISDICTION…………………………………….. 2

STATEMENT OF ISSUES PRESENTED…………………………... ….. 3

I.     Whether the District Court erred by granting IDSA's
       12(b)(6) Motion to Dismiss, in part, and dismissing Plaintiffs'
       claims for fraudulent and negligent misrepresentation…………. 3

II.    Whether the District Court erred by awarding IDSA its
       bill of costs in the amount of $43,940.06………………………. 3

STATEMENT OF THE CASE……………………………………… 3

       1.     Factual background………………………………… 3

       2.     Procedural history……………………………….. 15

SUMMARY OF THE ARGUMENT………………………………….... 20

ARGUMENT AND AUTHORITIES………………………………… 23

       A.     Standard of Review…………………………………. 23

       B.     The District Court erred by dismissing Plaintiffs'
              fraudulent and negligent misrepresentation claims……… 23

1.     Plaintiffs pled the essential elements of their misrepresentation claims because the Guidelines contain false statements of fact………………………… 23

2.     Even if the Guidelines are considered medical opinion, the statements are still actionable considering IDSA's knowledge of the falsity and the pervasive influence of their recommendations…………………… 33

3.     No special relationship is required for Plaintiffs to state a claim for fraudulent or negligent misrepresentation resulting in physical harm……….. 36

   a.     Under the most significant relationship test, either Texas or New York law applies………. 36

   b.     No special relationship is required to establish the element of reliance because IDSA compelled reliance on the Guidelines and it was foreseeable that Plaintiffs would be injured……………………………… 39

4.     Plaintiffs sufficiently pled their fraudulent and negligent misrepresentation claims with particularity as required by Rule 9(b)……..…….. 46

5.     Plaintiffs' fraudulent and negligent misrepresentation claims are not barred by judicial estoppel…………………………….…….. 49

6.     Plaintiffs' misrepresentation claims should not be struck as untimely because they were filed within the pleadings deadline……………... 51

C.     Because IDSA should not have prevailed, the the District Court erred by granting IDSA's bill of costs…………………………………………….. 52

CONCLUSION………………………………………………..   53

CERTIFICATE OF SERVICE…………………………………   54

CERTIFICATE OF COMPLIANCE………………………………   55

## TABLE OF AUTHORITIES

**CASES**                                                                                  **PAGE**

*Access Telecom, Inc. v. MCI Telecommunications Corp.*,
197 F.3d 694, 705 (5th Cir. 1999)……………………………………………… 37

*Allen v. C & H Distributors, L.L.C.*,
813 F.3d 566, 573 (5th Cir. 2015)……………………………………………… 49

*Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*,
115 F. App'x 662, 668–69 (5th Cir. 2004)………………………………….... 46

*Arkansas v. Wilmington Tr. Nat'l Ass'n*,
No. 3:18-CV-1481-L, 2020 WL 1249570,
at *7 (N.D. Tex. Mar. 16, 2020)……………………………………………51

*Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*,
249 S.W.3d 380, 384–85 (Tex. 2008)………………………………………...34

*Arnstein v. Manufacturing Chemists Ass'n, Inc.*,
414 F.Supp. 12, 14 (E.D.Pa.1976)……………………………………………… 45

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
343 F.3d 719, 723 (5th Cir. 2003)……………………………………………… 46

*Brown v. Neff*,
603 N.Y.S.2d 707, 709 (N.Y. Sup. Ct. 1993)…………………………………... 39

*Carter v. United States*,
494 F. App'x 148, 150 (2d Cir. 2012)…………………………………………….. 39

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285, 288 (5th Cir. 2004)……………………………………………… 23

*Cox v. Richards*,
761 F. App'x 244, 246 (5th Cir. 2019)…………………………………………… 49

*D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*,
973 S.W.2d 662, 664 (Tex. 1998) ……………………………………………24, 39

*Davis v. Boecheim,*
22 N.E. 3d 999, 1004-05 (N.Y. Sup. Ct. 2014)………………………………… 26

*Derrick v. Lincoln Nat'l Life Ins. Co.*,
No. 6:18-CV-00085, 2020 WL 4352758,
at *6 (W.D. Va. July 29, 2020)………………………………………………… 45, 47

*Dudley v. Offender Aid & Restoration of Richmond, Inc.*,
401 S.E.2d 878, 883 (1991)…………………………………………………….. 41

*Fox v. Custis,*
372 S.E.2d 373, 376 (Va. 1988)……………………………………………… 40

*Glenn v. Trauben*,
70 Va. Cir. 446 (Va. Cir. Ct. 2004)…………………………………………….. 34

*Gutierrez v. Collins,*
583 S.W.2d 312, 318 (Tex.1979)……………………………………………… 36

*Heard v. City of New York*,
623 N.E.2d 541, 545 (N.Y. 1993)…………………………………………… 39

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
302 F.3d 552, 564–65 (5th Cir. 2002)………………………………………...46-47

*Immuno AG. v. Moor-Jankowski*,
77 N.Y.2d 235, 243, 567 N.E.2d 1270, 1273 (N.Y. Sup. Ct. 1991)…………. 26

*In re Factor VIII or IX Concentrate Blood Prod. Litig.*,
25 F. Supp. 2d 837, 839–40 (N.D. Ill. 1998)………………………………… 43, 44

*In re Lipsky*,
460 S.W.3d 579, 594 (Tex. 2015)……………………………………………… 26

*In re Superior Crewboats, Inc.*,
374 F.3d 330, 334 (5th Cir. 2004)…………………………………………… 49, 50

*Janvey v. Brown*,
767 F.3d 430, 434 (5th Cir. 2014)…………………………………………… 36

x

*Jappell v. Am. Ass'n of Blood Banks,*
162 F. Supp. 2d 476, 481 (E.D. Va. 2001)……………………………………... 41, 42

*Kass v. Kass*,
91 N.Y.2d 554, 566, 696 N.E.2d 174, 180–81 (1998)……………………… 32

*Kimmell v. Schaefer*,
224 A.D.2d 217, 218, 637 N.Y.S.2d 147, 149,
*aff'd,* 89 N.Y.2d 257, 675 N.E.2d 450 (1996)………………………………….. 33

*King v. Nat'l Spa & Pool Inst., Inc.*,
570 So. 2d 612, 616 (Ala. 1990)…………………………………………….. 45

*LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*,
659 F.3d 450, 457 (5th Cir. 2011)………………………………………… 24

*Lauer v. City of New York,*
95 N.Y.2d 95, 100–01, 733 N.E.2d 184, 188 (2000)………………………… 39

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
594 F.3d 383, 388–89 (5th Cir. 2010)……………………………………….. 31

*Mathes v. Patterson-UTI Drilling Co. L.L.C.*,
44 F. Supp. 3d 691, 697 (S.D. Tex. 2014)………………………………… 36, 37

*Mortarino v. Consultant Eng'g Servs., Inc.*,
467 S.E.2d 778, 781 (Va. 1996)…………………………………………… 25

*Nasser v. Parker*,
455 S.E.2d 502, 503 (Va. 1995) ………………………………………... 40, 41

*Packard Norfolk, Inc. v. Miller,*
95 S.E.2d 207 (Va. 1956)…………………………………………………… 25

*Paull v. Cap. Res. Mgmt., Inc.*,
987 S.W.2d 214, 218 (Tex. App.—Austin 1999, pet. denied)……………… 25, 33

*Rountree v. Ching Feng Blinds Indus. Co.*,
393 F. Supp. 2d 942, 946 (D. Alaska 2005)……………………………… 45

*Snyder v. Am. Ass'n of Blood Banks*,
676 A.2d 1036 (N.J. 1996)……………………………………………..... 42, 44

*Sweely Holdings, LLC v. SunTrust Bank,*
820 S.E. 2d 596, 604 (Va. 2018)…………………………………………...47

*Tate v. Colony House Builders, Inc.*,
508 S.E.2d 597, 599 (Va. 1999)……………………………………… 25, 34

*Torrey v. Infectious Diseases Soc'y of Am.,*
No. 5:17-cv-00190-RWS, 2021 WL 6774574,
(E.D. Tex. Sept. 20, 2021)……………………………………19, 25, 29, 35, 44

*Trenholm v. Ratcliff,*
646 S.W.2d 927, 930 (Tex.1983)……………………………………….. 33

*Weigand v. Univ. Hosp. of New York Univ. Med. Ctr.*,
659 N.Y.S.2d 395, 399–400 (N.Y. Sup. Ct. 1997)…………………….... 43, 44

*Williams v. WMX Techs., Inc.*,
112 F.3d 175, 177 (5th Cir. 1997)……………………………………… 46

*ZT Emp. Servs., LLC v. Gallagher Benefit Servs., Inc.*,
No. 3:19-CV-381, 2021 WL 1199579, at *3 (S.D. Tex. Mar. 30, 2021)……. 24, 48

## S<span style="font-variant:small-caps">TATUTES</span>

15 U.S.C. §1 ………………………………………………………… 15

18 U.S.C. § 1962(a)-(d)……………………………………………………15

18 U.S.C. § 1965…………………………………………………... 2

28 U.S.C. § 1367…………………………………………………... 2

28 U.S.C. § 1920……………………………………………….. 20, 52

## RULES

Fed. R. Civ. P. 8(a)……………………………………………………... 48

Fed. R. Civ. P. 9(b)…………………………………………19, 46, 48, 49

Fed. R. Civ. P. Rule 12(b)(6)………………………………………… 3, 23

Fed. R. Civ. P. 54(d)………………………………………………… 20, 52

## OTHER AUTHORITY

Restatement (Second) of Torts § 310……………………………………24, 39, 41

Restatement (Second) of Torts § 311………..…………………………24, 39, 41

Restatement (Second) of Torts § 315……………………………………....40

Restatement (Second) of Conflict of Laws § 6……………………………… 36, 38

Restatement (Second) of Conflict of Laws § 145…………………………… 36

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request oral argument because this case concerns important questions regarding whether liability should be imposed against medical organizations when they communicate factual information to health care providers in a highly influential manner, in effect establishing the only acceptable treatment and testing standards for the hundreds of thousands of people suffering from chronic Lyme disease each year.

**INTRODUCTION**

The Infectious Disease Society of America (the "IDSA") promulgates inaccurate treatment and testing standards which are treated as mandatory by the medical community. While the IDSA purports to disclaim their Guidelines as a simple resource which should not supplant individual physician judgment, they are hardly treated as such.  Rather, they are treated as hard-and-fast rules, and the consequence for any doctor who may choose to treat their patients contrary to the Guidelines risks losing his or her medical license.

Whether the statements contained in the Guidelines can be construed as actionable statements of fact or mere medical opinion depends largely on context and a reasonable person's interpretation of them. Thus, in addition to considering the language used in the Guidelines—i.e., considering *how* the Guideline authors interpret and summarize research studies and clinical trials, as well as the treatment

1

recommendations and prohibitions they prescribe—the Court must also consider how the Guidelines have been interpreted, used, and applied by doctors and other hugely important players, (insurance companies), within the medical community.

Liability should be imposed against medical organizations which promulgate mandatory standards when the factual inaccuracy of those standards ultimately results in grave injury to the patients for whose benefit they are purportedly authored. The precedent set by the District Court will have far ranging consequences, not only for the segment of the population who suffers from chronic Lyme disease, but for *any* person facing a medical issue and confronted with "guidelines" from leading medical authorities concerning appropriate treatment options.  Because Plaintiffs adequately pled their claims against IDSA for fraudulent and negligent misrepresentation under the applicable law and pleadings standards, Plaintiffs' remaining misrepresentation claims against IDSA should be permitted to proceed past the pleadings stage.

### STATEMENT OF JURISDICTION

The district court had federal question jurisdiction over Plaintiffs' causes of action under 18 U.S.C. § 1965, The Racketeer Influenced and Corrupt Organizations Act (RICO), as well as supplemental jurisdiction over Plaintiffs' common law misrepresentation claims pursuant to 28 U.S.C. § 1367.

## STATEMENT OF ISSUES PRESENTED

I.     Whether the District Court erred by granting IDSA's 12(b)(6) Motion to Dismiss, in part, and dismissing Plaintiffs' claims for fraudulent and negligent misrepresentation.

II.    Whether the District Court erred by awarding IDSA its bill of costs in the amount of $43,940.06.

## STATEMENT OF THE CASE

### *1. Factual background.*

Lyme Disease Generally.

The Plaintiffs in this case are individuals who have suffered from chronic Lyme disease. ROA.5656.

Lyme disease is the most common tick-borne infection in North America and Europe and is the fastest-growing infectious disease in America. ROA.5659. The CDC estimates that 300,000 Americans are infected with Lyme disease each year. *Id*. Once infected, patients typically experience a wide range of symptoms, including fever, headache, swollen joints, fatigue, and skin rash. *Id*.  If the infection goes untreated, the disease may spread to the joints, heart, and the nervous system and may result in debilitating symptoms, including severe fatigue, anxiety, migraines, light sensitivity, and severe joint pain. *Id*. If Lyme disease continues untreated for a prolonged period, the infected suffer with crippling muscle and joint pain, disabling fatigue, arthritis, neurological disorders, cardiac disorders, and eventually invades

the brain causing depression, thoughts of suicide, brain fog, severe weakness, memory or concentration difficulties, bladder or bowel dysfunction, and visual loss. Left untreated, Lyme disease can lead to a painful and agonizing death. *Id*.

While many patients who contract Lyme disease can be cured with short-term antibiotic treatment, a large number of patients do not respond to short-term antibiotic treatment. *Id*. At least 60,000 Lyme patients a year require long-term antibiotic treatment, including expensive intravenous antibiotics, which costs anywhere from $1,000 to $50,000 per year. *Id*. These patients typically require long-term antibiotic treatment for many months until the symptoms are resolved. ROA.5660.

Chronic Lyme disease patients who do not receive this necessary treatment will suffer debilitating symptoms, will be in constant pain, will be unable to live a normal life, and will eventually die. *Id*.; *see also* ROA.5694–95 (discussing experience of Plaintiff, David Kocurek, who suffered from symptoms for years despite testing negative, was forced to visit over 25 doctors before he could find someone who would treat him, and after being forced to pay out-of-pocket for his treatment, eventually died from Lyme disease in 2016). Unfortunately, in nearly every instance where a patient suffers from chronic Lyme disease, the Lyme doctor's hands are tied in prescribing necessary treatment.

4

The Concerted Effort to Curtail Treatment.

Initially, insurance companies, including the Insurance Defendants in this case, provided coverage for Lyme disease patients, including long-term antibiotic treatment. ROA.5660. This allowed doctors to properly assesses and treat patients and prevented the suffering and death of many thousands of chronic Lyme disease patients. *Id*. However, in the 1990's, insurance companies decided that treatment of chronic Lyme disease was too expensive and red-flagged it. *Id*. For example, Blue Cross and Blue Shield created an arbitrary policy of restricting treatment of Lyme disease to 42-days without any medical or scientific justification. ROA.5661. Insurance companies generally began denying insurance coverage for antibiotics after 28 days of treatment, and any treatment beyond short-term antibiotics was deemed experimental. *Id*.

Around this same time, the Insurance Defendants began paying consulting fees to certain infectious disease experts, including Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. Eugene Shapiro, Dr. John J. Halperin, Dr. Robert B. Nadelman, Dr. Leonard Sigal, and Dr. Allen Steere (collectively, the "IDSA Panelists,") in exchange for the promulgation of the IDSA Guidelines. ROA.5662 (discussing the Civil Investigative Demands served by the Attorney General of Connecticut relating to the payment of compensation by the Insurance Defendants to the IDSA Panelists from 1998 through 2007). At a hearing before the Senate

5

Committee on Labor & Human Resources, one internationally known infectious

disease specialist summarized the problematic conflict of interest and testified:

> There is in this country a core group of university-based
> Lyme disease researchers and physicians whose opinions
> carry a great deal of weight. Unfortunately, many of them
> act unscientifically and unethically. They adhere to
> outdated, self-serving views and attempt to personally
> discredit those whose opinions differ from their own. They
> exert strong, ethically questionable influence on medical
> journals, *which enables them to publish and promote
> articles that are badly flawed*. They work with
> Government agencies to bias the agenda of consensus
> meetings and have worked to exclude from these meetings
> and scientific seminars those with ultimate opinions.
>
> They behave this way for reasons of personal or
> professional gain and are involved in obvious conflicts of
> interest.
>
> [T]hese individuals who promote this so-called "post
> Lyme syndrome" as a form of arthritis depend on funding
> from arthritis groups and agencies to earn their livelihood.
> *Some of them are known to have received large consulting
> fees from insurance companies to advise the companies to
> curtail coverage for any additional therapy beyond the
> arbitrary 30-day course*.

ROA.5663–64(emphases added). Thus, unsurprisingly, when the 2000 IDSA

Guidelines were published, they contained the same arbitrary requirement limiting

Lyme treatment to only short-term antibiotics for 28 days. ROA.5664:

> To date, there are no convincing published data that repeated or
> prolonged courses of either oral or iv antimicrobial therapy are effective
> for such patients. The consensus of the Infectious Diseases Society of

America (IDSA) expert-panel members is that there is insufficient evidence to regard "chronic Lyme disease" as a separate diagnostic entity.

*Id*.

When other doctors who were part of the original IDSA panel questioned why IDSA was not providing any consideration to other doctors who believe that short-term antibiotic treatment was insufficient, they were either removed from the panel or demoted. ROA.5665. Similarly, when appointing panel members for the promulgation of IDSA's updated 2006 version of the Guidelines, IDSA made a concerted effort to block the appointment of any panel members with divergent views. ROA.5688–89.

The 2006 Guidelines: Presented and Applied as Scientific Fact.

The 2006 IDSA Guidelines promote the idea that Lyme disease is a simple, rare illness that is easy to avoid, difficult to acquire, simple to diagnose, and easily cured with 28 days of antibiotics. ROA.5676. In addition to making affirmative statements that lead to improper treatment, the Guidelines also claim that Lyme disease generally can be diagnosed one of two ways: (i) the patient must exhibit an erythema migrans ("EM") rash; or (ii) the patient must test positive with a two-tier serological test. ROA.5677. While the Guidelines acknowledge studies and data which have made findings contrary to these general rules, the Guidelines do not describe them as objective contrary evidence from which medical practitioners can

make their own independent judgment. *See* ROA.6002–48. Rather, IDSA makes an effort to bury these instances within the Guidelines, explaining them away as being attributable to other health conditions, or characterizing them as very rare exceptions to the general rules which should not be anticipated by practitioners. *Id.*

The following statements, scattered throughout the 46 pages of the Guidelines, illuminate the gravamen of the Guidelines which reaffirm the lack of treatment failure from a short-term course of antibiotics and the need for two-tier serological testing, as well as the fact that the Guidelines are specifically intended for use by health care providers:

| Excerpt from 2006 IDSA Guidelines | Guideline Page Number | Record Cite | Context and Explanatory Information |
|---|---|---|---|
| "The guidelines are intended for use by health care providers who care for patients who either have these infections or may be at risk for them." | 1089 | ROA.6002, (Dkt. No. 378, Ex. C). | Introductory paragraph explaining purpose and use and describing them as evidence-based and prepared by experts. |
| "Diagnostic testing performed in laboratories with excellent quality-control procedures *is required* for confirmation of extracutaneous Lyme disease, HGA, and babesiosis." | 1090 | ROA.6003, (Dkt. No. 378, Ex. C). | Background and Executive Summary Section of Guidelines. (Emphasis added). |
| "There is no well-accepted definition of post-Lyme disease syndrome. . . . Whatever definition is eventually adopted, having once had objective evidence of *B. burgdorferi* infection must be a condition sine qua non." | 1094 | ROA.6007 (Dkt. No. 378, Ex. C). | Discussing appropriate definition and criteria for diagnosing Post-Lyme Disease Syndromes. |
| "There is no convincing biological evidence for the existence of symptomatic chronic *B. burgdorferi* infection among patients after receipt of recommended treatment regimens | 1094 | ROA.6007 (Dkt. No. 378, Ex. C). | Stating that there is *no evidence* of infection after recommended treatments, thus |

| | | | |
|---|---|---|---|
| for Lyme disease. Antibiotic therapy has not proven to be useful and is not recommended for patients with chronic (> 6 months) subjective symptoms after recommended treatment regimens for Lyme disease []." | | | questioning the existence of Post-Lyme Disease Syndromes at all. |
| "Because of a lack of biological plausibility, lack of efficacy, absence of supporting data, or the potential for harm to the patient, the following are *not* recommended for treatment of patients with any manifestation of Lyme disease: . . . long-term antibiotic therapy . . . ." | 1094 | ROA.6007 (Dkt. No. 378, Ex. C). | Expressly recommending *against* the use of long-term antibiotic therapy for patients who may exhibit symptoms of Post-Lyme Disease Syndromes. |
| "Untreated patients who remain seronegative, despite continuing symptoms for 6-8 weeks, are unlikely to have Lyme disease, and other potential diagnoses should be actively pursued." | 1101 | ROA.6014 (Dkt. No. 378, Ex. C). | Discussing early Lyme disease and appropriate diagnosis and treatment of Erythema Migrans ("EM"), the skin rash often seen after a tick bite. |
| "The possibility that these symptoms may have been related to a tick-transmitted coinfection was not evaluated in any of the studies. [] This has helped to foster highly speculative theories on how *B. burgdorferi* might survive in patients treated with a standard course of antimicrobial therapy." | 1103 | ROA.6016 (Dkt. No. 378, Ex. C). | Describing theories relating to instances of post-Lyme disease syndromes as "highly speculative." |
| "Most patients respond promptly and completely. Some individuals have persistent subjective complaints, despite receiving therapy that otherwise appears curative. Less than 10% of individuals do not respond to antibiotic therapy, as evidenced by the presence of objective clinical manifestations, and rarely is re-treatment required." | 1104 | ROA.6017 (Dkt. No. 378, Ex. C). | Summarizing results of various clinical trials relating to treatment of early Lyme disease. |
| "Because of a lack of biological plausibility, lack of efficacy, absence of supporting data, or the potential for harm to the patient, the following are | 1105 | ROA.6018 (Dkt. No. 378, Ex. C). | Expressly recommending *against* the use of long-term antibiotic |

9

| | | | |
|---|---|---|---|
| not recommended for treatment of patients with any manifestation of Lyme disease: . . . long-term antibiotic therapy . . . ." | | | therapy for treatment of early Lyme disease. |
| "Confirmation of the diagnosis requires serologic testing. All patients should be determined to be seropositive by 2-tier testing that includes an ELISA and IgG immunoblot []. | 1110 | ROA.6023 (Dkt. No. 378, Ex. C). | Explaining method of diagnosis with regards to rheumatologic manifestation of late Lyme disease. |
| "Shortly after treatment with conventional courses of antibiotics for Lyme disease [], a minority of patients continue to report symptoms or signs." | 1114 | ROA.6027 (Dkt. No. 378, Ex. C). | Discussing background and diagnosis of post-Lyme disease syndromes. |
| "In many patients, posttreatment symptoms appear to be more related to the aches and pains of daily living rather than to either Lyme disease or a tickborne coinfection." | 1115 | ROA.6028 (Dkt. No. 378, Ex. C). | Discussing background and diagnosis of post-Lyme disease syndromes. |
| "To summarize, it can be expected that a minority of patients with Lyme disease will be symptomatic following a recommended course of antibiotic treatment as a result of the slow resolution of symptoms over the course of weeks to months or as a result of a variety of other factors, such as the high frequency of identical complaints in the general population." | 1116 | ROA.6029 (Dkt. No. 378, Ex. C). | Discussing background and diagnosis of post-Lyme disease syndromes. |
| "Unfortunately, it is apparent that the term 'chronic Lyme disease' is also being applied to patients with vague, undiagnosed complaints who have never had Lyme disease. *When adult and pediatric patients regarded as having chronic Lyme disease have been carefully reevaluated at university-based medical centers, consistently, the majority of patients have had no convincing evidence of ever having had Lyme disease, on the basis of absence of objective clinical, microbiologic, or serologic evidence of past or present B. burgdorferi infection."* | 1117 | ROA.6030 (Dkt. No. 378, Ex. C). | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |

| | | | |
|---|---|---|---|
| **"Do viable *B. burgdorferi* persist in tissues despite antibiotic treatment?** There is no convincing evidence in North America for persistence of *B. burgdorferi* in the skin of humans after treatment with antibiotic regimens . . . ."  | 1117 | ROA.6030 (Dkt. No. 378, Ex. C). | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |
| "The notion that symptomatic, chronic *B. burgdorferi* infection can exist despite recommended treatment courses of antibiotics [] in the absence of objective clinical signs of disease, is highly implausible as evidenced by (1) the lack of antibiotic resistance in this genus [], (2) the lack of correlation of persistent symptoms with laboratory evidence of inflammation or with the eventual development of objective physical signs, and (3) the lack of precedent for such a phenomenon in other spirochetal infections []. | 1118 | ROA.6031 (Dkt. No. 378, Ex. C). | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |
| "Finally, Lyme disease lacks characteristics of other infections that justify longer treatment courses . . . ." | 1118 | ROA.6031 (Dkt. No. 378, Ex. C). | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |
| "To date, there is no convincing biological evidence for the existence of symptomatic chronic *B. burgdorferi* infection among patients after receipt of recommended treatment regimens for Lyme disease. Antibiotic therapy has not proven to be useful and is not recommended for patients with chronic (>6 months) subjective symptoms after administration of recommended treatment regimens for Lyme disease []." | 1120–21 | ROA.6033–34 (Dkt. No. 378, Ex. C). | Summarizing treatment recommendations for post-Lyme disease syndromes. |

These excerpts of absolute statements illustrates how, on the whole, the Guidelines state as fact that despite very rare exceptions, which should not be

11

expected, there is generally no treatment failure for Lyme disease and two-tier serological testing is needed to confirm a Lyme disease diagnosis.

IDSA's message is further confirmed by how the Guidelines have been characterized and treated within the medical community. Although IDSA claims its Guidelines are not "mandatory," they have been regarded as such by insurance companies, medical boards, and hence, health care providers. IDSA holds itself out as the pre-eminent authority on the treatment of infectious diseases in the United States, and it enforces the Guidelines as mandatory regulations in the treatment of Lyme disease. ROA.5686. The purported clout and influence exhibited by IDSA enables insurance companies to treat the Guidelines as mandatory. *Id*.

Further, the Guidelines are treated as *the* appropriate standard of care when investigating and sanctioning doctors who treat Lyme patients. *Id*. IDSA, in concert with the insurance companies, anonymously report Lyme doctors to medical boards who do not conform to the IDSA Guidelines' treatment and testing protocols. *Id*. This has a natural chilling effect of making doctors across the country afraid to diagnose or treat chronic Lyme patients out of fear of becoming the subject of an investigation by state board of medical examiners. ROA.5667–5671 (discussing the epidemic of insurance companies anonymously reporting Lyme doctors to medical boards and legislation which has been passed in New York, Virginia, and other states to protect doctors who prescribe antibiotics beyond the 28-day cutoff).

Thus, IDSA has spent the last few decades seeking to aggressively prevent the treatment of chronic Lyme disease, even though it knows there is overwhelming evidence to prove the existence of chronic Lyme disease,[1] and the presentation of the information contained in the Guidelines is representative of those efforts. ROA.5672. For instance, one of the founding members of the IDSA, who has since discredited the Guidelines for failing to acknowledge the existence of chronic Lyme disease, has noted "[i]t is a conundrum why a group of respected physicians who are members of the Infectious Disease Society of America have not recognized this and have, instead written a guideline that essentially denies that the syndrome exists." ROA.5674–5675. The Association of American Physicians and Surgeons has similarly opposed the Guidelines as containing effective "mandates and prohibitions":

> The mandate for specific laboratory confirmation is particularly objectionable, as testing for Lyme disease is notoriously insensitive and unreliable. Patients who do not meet this criterion would often be denied treatment that could mitigate severe chronic disability. In some cases, long-term treatment is required. Physicians must be able to exercise their professional judgment concerning the best treatment for each individual patient, without restraint by one-size-fits-all Guidelines, which amount to mandates and prohibitions.

---

[1] *See* ROA.5673–5676 (summarizing scholarly articles, legislation, statements of other doctors and researchers, the findings of the Connecticut Attorney General investigation, and the Association of American Physicians and Surgeons); *see also* ROA.5975, 5976 (summarizing deposition testimony of Dr. Wormser and Dr. Sigal in which they indignantly acknowledged the existence of treatment failure and further admitted that there was no test which could determine whether a patient has an active Lyme disease infection).

ROA.5675–5676. Accordingly, a plethora of examples outlined in Plaintiffs' Third Amended Complaint illustrate how the Guidelines are treated as "de facto" law, namely because, when doctors diagnose patients with Lyme disease that do not meet IDSA treatment standards or testing requirements, IDSA works with insurance companies to ensure the patient's treatment is not covered and the doctor loses his or her medical license. *See generally* ROA.5656–5713.

<u>Compelled Reliance on the Guidelines by Plaintiffs' Doctors</u>.

The effective mandatory nature of the Guidelines results in debilitating illness, years of misdiagnosis, and expensive out-of-pocket treatment for patients who suffer from chronic Lyme disease. Plaintiffs' Third Amended Complaint outlines the individual experiences of each of the Plaintiffs: (i) their difficulties with receiving a Lyme disease diagnosis from their doctors who rely on the Guidelines in the first instance; (ii) their severe and worsening symptoms which affected nearly every aspect of their daily lives; (iii) the length of time, travel, and other hurdles faced to simply find a doctor willing to treat them contrary to the Guidelines; and (iv) the out-of-pocket costs they were forced to incur for uncovered treatment, despite having health insurance. ROA.5694–5699. All of these injuries were incurred because of the pervasive reliance on the Guidelines' statements by Plaintiffs' doctors and others.

### 2. *Procedural history.*

Plaintiffs initiated this case on November 17, 2017. ROA.24. In their Original Complaint, Plaintiffs asserted claims against: (i) IDSA; (ii) Blue Cross and Blue Shield Association, Anthem, Inc., Blue Cross and Blue Shield of Texas, Aetna Inc., Cigna Corporation, Kaiser Permanente, Inc., United Healthcare Services, Inc., UnitedHealth Group Incorporation (the "Insurance Defendants"); and, (iii) the IDSA Panelists (collectively with the Insurance Defendants and IDSA, "Defendants"). ROA.76. Plaintiffs asserted claims against Defendants for: (i) RICO violations arising under 18 U.S.C. § 1962(a)–(d); and, (ii) an antitrust claim for violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1. ROA. 76–127.[2]

Beginning in 2019 and through 2021, Plaintiffs entered into settlement agreements with the Insurance Defendants, and various joint motions to stay the case deadlines were entered as the parties worked to finalize their settlement agreements. *See generally* ROA.52–64.

On March 27, 2020, the District Court entered an Amended Docket Control. ROA.4729. The Amended Docket Control Order set the case for a jury trial on September 27, 2021. *Id*. The Amended Docket Control also set the deadline to

---

[2] On March 25, 2019, Plaintiffs filed a First Amended Complaint, removing two of the plaintiffs and amending some of their allegations. The substantive claims and causes of action remained the same. ROA.2995.

amend pleadings for April 16, 2021. ROA.4731. Within that entry, the Court's

Docket Control Order expressly provides:

> It is not necessary to file a Motion for Leave to Amend before the
> deadline to amend pleadings. It is necessary to file a Motion for Leave
> to Amend after the deadline.

*Id*.

Plaintiffs deposed IDSA Panelists, Gary Wormser and Eugene Shapiro, on

January 7, 2021 and December 21, 2020, respectively. Plaintiffs also deposed

IDSA's corporate representative, Christopher Busky, on November 24, 2020. Dkt.

No. 378, at 9–10. During these depositions, Plaintiffs learned information which was

crucial to Plaintiffs' ability to adequately plead and ultimately prove, actionable

claims relating to IDSA's false representations contained in their Guidelines. *See*

ROA.5973–76. Namely, the IDSA Panelists now indignantly claim that it would

"make no sense" to claim that there was no treatment failure for Lyme disease, and

that there is no single test to determine whether a patient has an active Lyme Disease

infection. *Id*.

On January 7, 2021, Plaintiffs filed a Second Amended Complaint. ROA.4861

(Dkt. No. 352). At the time, IDSA and the IDSA Panelists were, in essence, the only

remaining defendants. The Second Amended Complaint added the following

misrepresentation claims against IDSA: (i) fraudulent misrepresentation involving

risk of physical harm; and (ii) negligent misrepresentation involving the risk of physical harm. ROA.4912–14.

On January 21, 2021, IDSA and the IDSA Panelists filed a Motion to Dismiss Plaintiffs' Second Amended Complaint, or in the Alternative, Motion to Strike Plaintiffs' New Misrepresentation Claims. ROA.5138 (Dkt. No. 355).

On February 3, 2021, IDSA and the IDSA Panelists filed a Motion for Summary Judgment as to Plaintiffs' RICO and Antitrust Claims. ROA.5175 (Dkt. No. 357). Plaintiffs filed a Response to this Motion on March 2, 2021. ROA.5349 (Dkt. No. 373).

On February 4, 2021, Plaintiffs filed two sealed documents at Docket Nos. 361 and 362: (i) a Third Amended Complaint, and (ii) a Response to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint.[3] Unsealed versions of these same pleadings were filed again on March 5, 2021 and March 8, 2021 at Docket Nos. 377 and 380. ROA.5656—5718 and ROA.6073–6093. It is the claims alleged in Plaintiffs' Third Amended Complaint which are at issue in this appeal.

On February 12, 2021, IDSA and the IDSA Panelists filed a Motion to Dismiss or Strike Plaintiffs' Third Amended Complaint. ROA.5283. Defendants intended for this pleading to also serve as Defendants' Reply in support of their Motion to Dismiss or Strike Plaintiffs' Second Amended Complaint to avoid

---

[3] Because they were sealed, they do not appear in the Electronic Record on Appeal (EROA).

duplicative briefing. ROA.5285. On February 26, 2021, Plaintiffs filed a sealed Response to Defendants' Motion to Dismiss the Third Amended Complaint.[4] An unsealed version of the same pleading was filed again on March 5, 2021 at Docket No. 377. ROA.5965.[5]

On April 22, 2021, the parties filed a Joint Stipulation of Dismissal, dismissing the IDSA Panelists, as well as Plaintiffs' RICO claims, with prejudice. ROA.6328 (Dkt. No. 396). The following day, the District Court held a motions hearing on IDSA's Motion for Summary Judgment on the remaining antitrust claims and IDSA's Motions to Dismiss the Misrepresentation Claims asserted in the Third Amended Complaint. ROA.6333 (Dkt. No. 397).

On September 9, 2021, the District Court entered an Order granting IDSA's Motion for Summary Judgment as to Plaintiffs' antitrust claims. ROA.6388 (Dkt. No. 407).

On September 20, 2021, the District Court entered the Order at issue in this appeal, dismissing Plaintiffs' negligent and fraudulent misrepresentation claims. ROA.6408 (Dkt. No. 408). The District Court concluded that Plaintiffs' misrepresentation claims failed because Plaintiffs failed to plead any actionable false

---

[4] Because it was sealed, it does not appear in the EROA.

[5] The District Court's Order references the sealed docket entries for these pleadings. *See e.g.*, ROA.6408, at 6417(referencing Dkt. No. 370 as Plaintiffs' Response to the Motion to Dismiss the Third Amended Complaint).

statements made by IDSA in the Guidelines as a matter of law. ROA.6418; *Torrey*

*v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2021 WL 6774574,

at *5 (E.D. Tex. Sept. 20, 2021)("To sustain either claim for misrepresentation,

Plaintiffs must plead that the representations are factual statements, that

the statements are false and that Plaintiffs detrimentally relied on those

misrepresentations of fact.")(internal citations omitted). The District Court did not

reach issues relating to: choice of law and third-party reliance, IDSA's contention

that Plaintiffs' failed to meet Rule 9(b)'s heightened pleading standard, or IDSA's

contention that Plaintiffs' misrepresentation claims should be struck based on the

doctrine of judicial estoppel or the applicable Docket Control Order.

On October 19, 2021, Plaintiffs filed a Notice of Appeal seeking to challenge

the District Court's Order on the misrepresentation claims. ROA.6431 (Dkt. No.

412). That initiated Case No. 21-40782 in this Court. On November 24, 2021, IDSA

filed a Motion to Dismiss the first appeal for lack of jurisdiction. In that Motion,

IDSA argued the appeal was premature because, at the time, Plaintiffs were still

working to finalize settlement agreements with various Insurance Defendants, and

the District Court had not yet entered orders dismissing them. Thus, IDSA argued

that the District Court's September 20, 2021 Order was not a "final decision" of the

lower court. On December 10, 2021, this Court granted IDSA's Motion to Dismiss

the first appeal without prejudice to Plaintiffs' ability to refile a notice of appeal once all parties were dismissed. ROA.6429.

On January 6, 2022, IDSA filed a Motion for Entry of its Bill of Costs seeking an award of costs in the amount of $43,940.06 pursuant to Federal Rule of Civil Procedure 54(d), the District Court's Standing Order, and 28 U.S.C. § 1920. ROA.6442 (Dkt. No. 417). On October 4, 2022, the District Court entered an Order granting IDSA's Motion for Entry of Its Bill of Costs in the amount of $43,940.06. ROA.6499 (Dkt. No. 442).

On November 1, 2022, Plaintiffs filed a Notice of Appeal initiating the instant appeal in which Plaintiffs challenge: (i) the Order dismissing Plaintiffs' negligent and fraudulent misrepresentation claims; and (ii) the Order granting IDSA its bill of costs. ROA.6507 (Dkt. No. 446).

## SUMMARY OF THE ARGUMENT

The District Court erred in ruling that the chronic Lyme disease treatment and testing standards promulgated by IDSA through its Guidelines are not actionable. In considering whether the Guidelines contain actionable statements of fact, the District Court failed to give proper weight to the overall import of the Guidelines' recommendations based on context—i.e., how the information is presented and how that information has been interpreted and applied as scientific fact within the medical community.

Moreover, even if the Guidelines' recommendations are construed as medical opinion, those statements are still actionable. IDSA knew the ultimate statements, littered throughout their Guidelines, were false and that it was regarded as the preeminent authority on Lyme disease treatment standards by practitioners and medical boards. The District Court erred when it concluded that Plaintiffs doctors were equally capable of reviewing the studies and papers cited in the Guidelines because it failed to consider the pervasive impact the Guidelines have on any doctors' ability to exercise independent judgment in their treatment of Lyme patients, as alleged in detail by Plaintiffs. Accordingly, Plaintiffs sufficiently alleged that IDSA's Guidelines should be treated as an exception to the general rule where medical opinion is in fact actionable, where, as here, the insufficient treatment and testing standards espoused by IDSA result in physical harm, suffering, and death to thousands of chronic Lyme disease patients each year.

Texas or New York law should apply to Plaintiffs' misrepresentation claims, but even if Virginia law applies as alleged by IDSA, Plaintiffs misrepresentation claims still survive because Plaintiffs pled sufficient facts to establish the reliance element of their claims under a derivative reliance theory. Considering the degree of control wielded by IDSA in compelling reliance on the Guidelines by Plaintiffs' doctors and others within the medical community, Plaintiffs' physical injuries were foreseeable. Because courts treat negligent misrepresentation claims as nothing more

21

than a claim of negligence, the same considerations regarding whether to impose liability against medical organizations in a negligence context apply equally here. The District Court erred by distinguishing cases concerning claims against medical organizations on that basis. IDSA has dominated the establishment of Lyme testing and treatment standards and has worked with state medical board to compel doctors' reliance on the same. Thus, no special relationship is required to impose liability against IDSA for the fraudulent and negligent misrepresentations promulgated through its Guidelines.

Finally, all other bases through which Defendants seeks to strike Plaintiffs' claims fail: (i) Plaintiffs pled their fraud claim with sufficient particularity, and even if they did not, Plaintiffs' negligent misrepresentation claim should survive as it satisfied the Rule8(a) pleading standard; (ii) Plaintiffs' misrepresentation claims are not barred by judicial estoppel; and (iii) Plaintiffs' Third Amended Complaint should not be struck as untimely because it was filed within the Court's pleadings deadline.

Because the District Court erred in ruling that Plaintiffs' misrepresentation claims were not actionable, the judgment below should be reversed, and the case remanded for further proceedings.

## ARGUMENT AND AUTHORITIES

### A. Standard of Review.

This Court reviews dismissals under Rule 12(b)(6) *de novo*. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)(internal citations omitted). The Court must accept as true well-pleaded factual allegations in the complaint. *Id*. "The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff." *Id*. Dismissal should only be upheld "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*.

Construing the Third Amended Complaint's misrepresentation claims in the light most favorable to Plaintiffs, Plaintiffs misrepresentation claims are actionable. Accordingly, IDSA's Motion to Dismiss should have been denied.

### B. The District Court erred by dismissing Plaintiffs' fraudulent and negligent misrepresentation claims.

#### 1. Plaintiffs pled the essential elements of their misrepresentation claims because the Guidelines contain false statements of fact.

To pursue a claim for negligent misrepresentation, Plaintiffs must allege the following elements: (i) the defendant negligently gave false information to another; (ii) the other person reasonably relied on such information; and (iii) physical harm was caused by such reliance either to: (a) the person who relied; or (b) to such third persons as the actor should expect to be put in peril by the negligent action taken.

Restatement (Second) of Torts § 311 (1965); *see also D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998) (per curiam). Similarly, to pursue a claim for fraudulent misrepresentation, Plaintiffs must allege: (i) an actor made a misrepresentation to another; (ii) the actor intended for his statement to induce, or should realize that it was likely to induce, action by the other or by a third person, which involved an unreasonable risk of physical harm; (iii) the actor knew his statement was false or that he did not have the knowledge which he professed; and, (iv) by acting on such representation the other party, or a third party, suffered physical harm.    Restatement 2d § 310. Thus, "[f]raud and negligent misrepresentation both share as an element that a false representation was made, but negligent misrepresentation is distinct from fraud, particularly because a negligent misrepresentation lacks fraudulent intent." *ZT Emp. Servs., LLC v. Gallagher Benefit Servs., Inc.*, No. 3:19-CV-381, 2021 WL 1199579, at *3 (S.D. Tex. Mar. 30, 2021)(internal citations omitted).[6]

Here, the District Court dismissed both of Plaintiffs' misrepresentation claims finding that Plaintiffs failed to adequately plead the first essential element of a "false

---

[6] The parties dispute whether Texas, New York, or Virginia law should apply to Plaintiffs' misrepresentation claims. Because the element requiring a false statement is the same under any state's substantive law, the Court need not resolve the choice-of-law question with regards to this issue. *See LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 457 (5th Cir. 2011).

representation." *Torrey*, 2021 WL 6774574, at *5.[7] The District Court properly concluded that in determining whether the Guidelines contain actionable statements of fact, it must look at the content of the Guidelines in their entirety, rather than isolated statements standing alone. *Id.* However, the District Court erred in its holding that the Guidelines are medical opinion because the District Court failed to consider the purpose of the Guidelines and their overall import as presented and applied within the medical community. *Id.* at *6.

To determine whether challenged statements are statements of fact or of opinion, courts "must review them in the context in which each statement is made." *Paull v. Cap. Res. Mgmt., Inc.*, 987 S.W.2d 214, 218 (Tex. App.—Austin 1999, pet. denied). Rather than employ a bright line test to ascertain whether false representations constitute matters of opinion or statements of fact, "each case must in large measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter *and interpreted by surrounding circumstances*." *Mortarino v. Consultant Eng'g Servs., Inc.*, 467 S.E.2d 778, 781 (Va. 1996)(internal citation omitted)(emphasis added); *see also Tate v. Colony House Builders, Inc.*, 508 S.E.2d 597, 599 (Va. 1999)(citing *Packard Norfolk, Inc. v. Miller,* 95 S.E.2d 207 (Va. 1956)("The relative knowledge of the parties dealing, their intentions and all of the

---

[7] *See also* ROA.6418.

Case: 22-40728    Document: 18    Page: 39    Date Filed: 02/08/2023

surrounding circumstances, which can only be gathered from the evidence, affect the interpretation which the courts put upon representations in determining whether they be of fact or opinion.").

In considering the meaning of a statement and whether it is fact or opinion, courts should consider "a reasonable person's perception of the entirety of a publication" in the specific context in which it was made. *See e.g. In re Lipsky*, 460 S.W.3d 579, 594 (Tex. 2015) (considering the entirety of the defendant's statements in the defamation context and the overall "gist" of such publication). The key inquiry is whether the challenged publication reasonably appears to state or imply assertions of objective fact. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 243, 567 N.E.2d 1270, 1273 (N.Y. Sup. Ct. 1991) (considering the "plain import" of the challenged statement in the libel context). "In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression used from the point of view of a reason person." *Id.* at 1273–74. "[C]ourts cannot stop at literalism." *Id.*[8]

Here, the District Court erred because it literally interpreted the statements in the Guidelines without giving proper consideration to the context in which they were published and the perception of them as applied by medical practitioners, other

---

[8] *Davis v. Boeheim*, 22 N.E.3d 999, 1004–05 (N.Y. Sup. Ct. 2014)("Distinguishing between fact and opinion is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean . . . .")(internal citation omitted).

researchers, and influential players within the medical community. IDSA argued that the Guidelines could not possibly be interpreted as statements of fact because, at various points throughout the publication, they do in fact acknowledge instances of treatment failure and they acknowledged the insensitive nature of serological testing for diagnosis at the early stages of Lyme disease. ROA.5299–5300(Dkt. No. 363, at 15–16)(but citing section of Guidelines focused on "early Lyme disease"; *see also* ROA.6206 (Dkt. No. 383, at 9, n. 5) (claiming that "the Guidelines do discuss—at great length—the available studies on this topic, whether described as 'chronic Lyme disease' or as symptoms persisting following treatment (i.e., treatment failure).").

However, where the Guidelines do acknowledge these instances of treatment failure, they attempt to bury them as rare, and explain them away as being attributable to other factors. The summary below highlights the IDSA's skepticism and overall disapproval of the studies relating to instances of chronic Lyme disease, also described as "post-Lyme disease syndrome", referenced in the Guidelines:

| | | | |
|---|---|---|---|
| "Shortly after treatment with conventional courses of antibiotics for Lyme disease [], a minority of patients continue to report symptoms or signs." | 1114 | ROA.6027 | Discussing background and diagnosis of post-Lyme disease syndromes. |
| "In many patients, posttreatment symptoms appear to be more related to the aches and pains of daily living rather than to either Lyme disease or a tickborne coinfection." | 1115 | ROA.6028 | Discussing background and diagnosis of post-Lyme disease syndromes. |
| "To summarize, it can be expected that a minority of patients with Lyme disease will be symptomatic following a recommended course of antibiotic | 1116 | ROA.6029 | Discussing background and diagnosis of post- |

| | | | |
|---|---|---|---|
| treatment as a result of the slow resolution of symptoms over the course of weeks to months or as a result of a variety of other factors, such as the high frequency of identical complaints in the general population." | | | Lyme disease syndromes. |
| "Unfortunately, it is apparent that the term 'chronic Lyme disease' is also being applied to patients with vague, undiagnosed complaints who have never had Lyme disease. *When adult and pediatric patients regarded as having chronic Lyme disease have been carefully reevaluated at university-based medical centers, consistently, the majority of patients have had no convincing evidence of ever having had Lyme disease, on the basis of absence of objective clinical, microbiologic, or serologic evidence of past or present* B. burgdorferi *infection."* | 1117 | ROA.6030 | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |
| **"Do viable *B. burgdorferi* persist in tissues despite antibiotic treatment?** There is no convincing evidence in North America for persistence of *B. burgdorferi* in the skin of humans after treatment with antibiotic regimens . . . ." | 1117 | ROA.6030 | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |
| "The notion that symptomatic, chronic *B. burgdorferi* infection can exist despite recommended treatment courses of antibiotics [] in the absence of objective clinical signs of disease, is highly implausible as evidenced by (1) the lack of antibiotic resistance in this genus [], (2) the lack of correlation of persistent symptoms with laboratory evidence of inflammation or with the eventual development of objective physical signs, and (3) the lack of precedent for such a phenomenon in other spirochetal infections []. | 1118 | ROA.6031 | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |

| | | | |
|---|---|---|---|
| "Finally, Lyme disease lacks characteristics of other infections that justify longer treatment courses . . . ." | 1118 | ROA.6031 | Discussing post-Lyme disease syndrome, posttreatment chronic Lyme disease, and chronic Lyme disease. |
| "To date, there is no convincing biological evidence for the existence of symptomatic chronic *B. burgdorferi* infection among patients after receipt of recommended treatment regimens for Lyme disease. Antibiotic therapy has not proven to be useful and is not recommended for patients with chronic (>6 months) subjective symptoms after administration of recommended treatment regimens for Lyme disease []." | 1120–21 | ROA.6033–34 | Summarizing treatment recommendations for post-Lyme disease syndromes. |

The District Court similarly relied on the disclaimer on the first page of the Guidelines to conclude that Plaintiffs could not recover for the Guidelines' statements. *Torrey*, 2021 WL 6774574, at *6.[9] ("[The Guidelines] are not intended to supplant physician judgment with respect to particular patients or special clinical situations."). However, this disclaimer, placed in fine print in an introductory footnote, directly contradicts the substantive introduction stated in bold font above it that "the guidelines are intended for use by health care providers who care for patients who either have these infections or may be at risk for them." ROA.6002. It also contradicts the reality of which IDSA is aware. IDSA exerts such substantial control over how Lyme disease is treated and covered within the medical

---

[9] ROA.6419.

community, which effectively suffocates any doctor's ability to make an independent assessment based on individual patient circumstances. The Guidelines hamstring any doctors' ability to exercise independent physician judgment with regards to chronic Lyme disease patients, if they wish to keep their medical license. This is not a hyperbole pled by Plaintiffs, as evidenced by the fact that several states have passed legislation to prevent this very phenomenon. ROA.5667–5671 (Dkt. No. 377, at ¶58–67).

A review of the substance of the Guidelines, as well as the summaries and recommendations contained throughout them, further supports that, on the whole, the Guidelines contain actionable false statements with regards to instances of treatment failure and the necessary use of serological testing. For example, in the Executive Summary Section of the Guidelines, with regards "Post-Lyme Disease Syndromes", the Guidelines affirmatively state:

> There is no convincing biological evidence for the existence of symptomatic chronic *B. burgdorferi* infection among patients after receipt of recommended treatment regimens for Lyme disease. Antibiotic therapy has not proven to be useful and is not recommended for patients with chronic (> 6 months) subjective symptoms after recommended treatment regimens for Lyme disease (E-1).

ROA.6007 (Dkt. No. 378, Ex. C, at 1094). By stating that there is no evidence of infection after recommended short-term antibiotic treatments, IDSA's Guidelines effectively question the existence of Post-Lyme disease syndromes at all—i.e., the gravamen of the Guidelines is that they deny the existence of treatment of failure.

The Guidelines further expressly recommend *against* the use of long-term antibiotic therapy for patients who may exhibit symptoms of Post-Lyme Disease Syndromes.

> Because of a lack of biological plausibility, lack of efficacy, absence of supporting data, or the potential for harm to the patient, the following are *not* recommended for treatment of patients with any manifestation of Lyme disease: . . . long-term antibiotic therapy . . . .

*Id.*

The District Court relied on *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 388–89 (5th Cir. 2010) as support that it properly interpreted the Guidelines in light of their context because they include "isolated statements from complex documents." However, *Lone Star Fund V* is distinguishable because it involved a statement that arose in an entirely different context. There, this Court considered the meaning of a "no delinquency" provision in a purchase agreement which stated that certain trusts should not contain any delinquent mortgages. 594 F.3d at 388. In a contractual context, however, the parties were free to negotiate additional terms which could manifest their intention as to the meaning of the "no delinquency" representation, which they did. *Id*. at 389. Thus, because the purchase agreement specifically contemplated some mortgages may in fact be delinquent, and specifically included a "sole remedy" provision to rectify any such error in the statement at issue, this Court held that the defendant made no actionable misrepresentations. *Id*.

Here, however, neither the IDSA Panelists who authored the Guidelines, nor the practitioners who are effectively bound by their recommendations, had an opportunity to negotiate the Guidelines' language to ensure that the overall tenor would sufficiently reflect the existence of a disagreement or controversy concerning chronic Lyme disease and the proper testing and treatment for same. Moreover, even in the contractual context "[f]orm should not prevail over substance and a sensible meaning of words should be sought." *Kass v. Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174, 180–81 (1998). This is equally applicable here. Thus, to determine whether IDSA's Guidelines contain actionable false statements their overall meaning should be determined by looking at the substance of the statements as a whole in light of the context in which they were written and how they have been interpreted by the audience for whom they were written—the doctors who are effectively forced to treat patients within the bounds of these standards.

Because Plaintiffs adequately alleged that within the context of the medical community, the Guidelines are treated as scientific fact, not mere medical opinion, the District Court erred in ruling that the Guidelines do not contain actionable statements of fact.

**2. Even if the Guidelines are considered medical opinion, the statements are still actionable considering IDSA's knowledge of the falsity and the pervasive influence of their recommendations.**

There are exceptions to the general rule that expressions of opinion cannot support a misrepresentation claim. These exceptions generally fall into three categories: "(1) an opinion may support a fraud claim if the speaker knows the statement is false; (2) an expression of an opinion as to the happening of a future event may constitute fraud; and (3) an opinion based on past or present facts may support an action for fraud." *Paull v. Cap. Res. Mgmt., Inc.*, 987 S.W.2d 214, 219 (Tex. App.—Austin 1999, pet. denied)(citing *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983)). In determining whether statements of opinion may be actionable, courts consider relevant circumstances such as whether "a speaker purports to have special knowledge of the facts or does have superior knowledge of the facts—for example, when the facts underlying the opinion are not equally available to both parties—a party may maintain a fraud action." *Id*; *see also Kimmell v. Schaefer*, 224 A.D.2d 217, 218, 637 N.Y.S.2d 147, 149, *aff'd,* 89 N.Y.2d 257, 675 N.E.2d 450 (1996)("[W]here one party does have superior knowledge, the expression of an opinion implies that the declarant knows facts which support that opinion and that he knows nothing which contradicts the statement.")(internal citations omitted).

Additionally, in some circumstances, the law may allow misrepresentation claims based on what might otherwise appear to be opinions taking into

consideration "the nature of the statement, the relative knowledge of the parties, and all the surrounding circumstances." *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 384–85 (Tex. 2008)(applying Virginia law and citing *Tate*, 508 S.E.2d at 599, among other Virginia cases holding opinion-based statements were still actionable as fraud). In fact, at least one Virginia court has recognized situations "where medical opinion should be taken as fact, especially in light of the relative position of the parties." *Glenn v. Trauben*, 70 Va. Cir. 446 (Va. Cir. Ct. 2004)(holding that plaintiff adequately plead fraud claim based on inaccurate medical opinion).

Even if the Court finds that the District Court properly characterized the treatment standards promulgated by IDSA's Guidelines as medical opinion, an exception to the general rule should apply. First, IDSA knew the Guidelines' statements were false. This was evidenced by the fact that IDSA kicked off or demoted any doctors or researchers from its expert panel who espoused contrary views relating to chronic Lyme disease and the appropriate testing and treatment standards. ROA.5664–5665. Deposition testimony from Dr. Wormser and Dr. Sigal, two of the IDSA Panelists, further confirmed that they were fully aware of the existence of treatment failure and stated that it would "make no sense" to suggest otherwise, despite that that is exactly what the Guidelines do in fact suggest. ROA.5974. Dr. Sigal and Dr. Dattwyler, another IDSA Panelist, further testified

that there was no readily available test to determine whether a patient had an active Lyme disease infection and described the two-tier test as inaccurate and completely unreliable. ROA.5976–77.

The District Court also improperly concluded that the statements contained in the Guidelines were not actionable because "Plaintiffs' doctors were equally capable of reviewing the studies and papers cited as the basis for the opinions expressed in the IDSA Guidelines." *Torrey*, 2021 WL 6774574, at *6.[10] This conclusory assertion fails to take into account the nature of the Guidelines and all of the surrounding circumstances, namely, the pervasive impact the Guidelines have on the medical community. Considering the symbiotic way in which the insurance companies and IDSA work together to ensure they shape insurance coverage, and the way in which most doctors' hands are tied to do anything other than treat patients within the confines of the Guidelines' standards unless they wish to risk losing their medical license, Plaintiffs adequately pled that their doctors were *not* in fact equally capable of reviewing and assessing the studies and papers cited in the Guidelines and making their own independent judgment and treatment decisions from those assessments.

Based on the foregoing, Plaintiffs properly pled that IDSA's Guidelines are actionable, and the District Court's holding to the contrary was in error.

---

[10] ROA.6420.

**3. No special relationship is required for Plaintiffs to state a claim for fraudulent or negligent misrepresentation resulting in physical harm.**

    **a. Under the most significant relationship test, either Texas or New York law applies.**

Choice of law issues for supplemental state law claims are governed by the forum state in which the federal court is sitting. *Janvey v. Brown*, 767 F.3d 430, 434 (5th Cir. 2014). "Texas courts follow the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." *Id.* (internal citation omitted). "Specifically, the Texas Supreme Court utilizes the factors set out in Sections 6 and 145 of the Restatement (Second) of Conflict of Laws for purposes of determining the most significant relationship in tort cases." *Mathes v. Patterson-UTI Drilling Co. L.L.C.*, 44 F. Supp. 3d 691, 697 (S.D. Tex. 2014)(citing *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979)). These factors include (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and, (d) the place where the relationship, if any, between the parties is centered. Restatement (Second) of Conflict of Laws § 145 (1971).[11]

---

[11] These factors are also evaluated against the following policy concerns: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. Restatement 2d § 6.

IDSA argues that Virginia law should apply because it is the place where IDSA is located. ROA.5295–5296 (Dkt. No. 363, at 11–12). However, in making this argument, IDSA fails to give *any* weight to any of the other factors, arguing that because Plaintiffs are each from several different states, Plaintiffs have failed to adequately allege which state had the most significant relationship to each of their injuries. ROA.5296, 6205 (Dkt. No. 363, at 12 and Dkt. No. 383, at 8). This Court should not ignore the other choice-of-law factors simply because Plaintiffs are victims of a concerted scheme to distribute misinformation nationwide, and thus, Plaintiffs injuries due to the reliance on that information have been sustained across several states.

Additionally, the place where the injury occurred generally carries more weight in determining which state has the most significant relationship to the substantive issue. *See Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 705 (5th Cir. 1999)(noting that Texas law should apply because Texas was the site of the injury and the home to the injured business); *see also Mathes*, 44 F. Supp. 3d at 698 (noting that the principal place of business of the defendants receives less weight than the place of injury in the choice of law analysis). This does not change simply because there are several states where the Plaintiffs' injuries occurred. At least two of the Plaintiffs resided in, and sought medical treatment, in

Texas. ROA.5657, 5694–95 (Dkt. No. 377, at ¶1–2 and ¶123–124).[12] Thus, giving more weight to the first factor, Texas law should apply.

Alternatively, New York law should apply because it is the place where the conduct causing Plaintiffs' injuries occurred. ROA.5980. New York is where the IDSA Panelists primarily live and work, and they all testified that they authored the Guidelines at their home offices, not at IDSA's headquarters. *Id.* (citing ROA.358–361Dkt. No. 40, at 15–19). Dr. Wormser and Dr. Dattwyler also specifically testified during depositions that they wrote the Guidelines in New York. *Id.* In addition to being the situs where the Guidelines were authored, New York is also where many of the IDSA Panelists received payments from the Insurance Defendants. ROA.5666 (Dkt. No. 377, at ¶55). New York is also one of the locations identified in Plaintiffs' Complaint where doctors were prosecuted before state medical boards. ROA.5670 (Dkt. No. 377, at ¶64.[13]

Considering the location of Plaintiffs' injuries, the location where the conduct causing the injury occurred, and the policy considerations set forth in Section 6 of

---

[12] While not a named plaintiff, Plaintiffs' pleadings further highlighted the effect the Guidelines had in Texas, explaining that when Texas Senator Chris Harris was diagnosed with Lyme disease, he struggled to find long-term treatment and thus, attempted to pass legislation in Texas as well. *Id.* at ¶ 72.

[13] Plaintiffs further alleged a substantial Lyme problem and connection to New York by outlining the number of Lyme disease cases in New York, as well as legislation passed in New York related to Lyme disease. *Id.* at ¶ 58–59, 72.

the Restatement, Texas, or alternatively New York, substantive law should be applied to Plaintiffs' misrepresentation claims.

### b. No special relationship is required to establish the element of reliance because IDSA compelled reliance on the Guidelines and it was foreseeable that Plaintiffs would be injured.

Texas and New York recognize claims for fraudulent and negligent misrepresentation involving risk of physical harm under Restatement Second of Torts §§ 310 and 311. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998)("A party may recover for negligent misrepresentations involving a risk of physical harm only if actual physical harm results."); *see also Heard v. City of New York*, 623 N.E.2d 541, 545 (N.Y. 1993).[14] Under the Restatement, no special relationship is required between the actor and the injured party, and liability will lie even where the plaintiff did not directly rely on the false statement. *Brown v. Neff*, 603 N.Y.S.2d 707, 709 (N.Y. Sup. Ct. 1993)("[T]he

---

[14] IDSA inaccurately argued that *Heard v. City of New York* was no longer good law and was, in essence, overruled by *Lauer v. City of New York*, 95 N.Y.2d 95, 100–01, 733 N.E.2d 184, 188 (2000). ROA.6209 (Dkt. No. 383, at 12). However, *Lauer v. City of New York* focused on the claim of negligent infliction of emotional distress, not negligent misrepresentation. Moreover, in deciding whether the plaintiff could maintain an action against the municipality for the medical examiner's negligence in *Lauer*, the court did not even consider its prior analysis specifically relating to misrepresentation claims in *Heard* or § 311 of the Restatement. *See id.* at 187–188. Thus, the Second Circuit's conclusion that *Lauer v. City of New York* was "the" precedent on point with regards to application of § 311 was in error. *See Carter v. United States*, 494 F. App'x 148, 150 (2d Cir. 2012). The other New York cases cited by IDSA either do not involve misrepresentation claims involving physical harm or they similarly fail to address the Court of Appeal of New York's decision in *Heard* or § 311. ROA.6209–6211 (Dkt. No. 383, at 11–13).

misrepresenter may be liable not only to the party in privity but also to those whom the misrepresenter should realize are likely to be imperiled.").

However, even if Virginia law applies, Plaintiffs have still alleged actionable misrepresentation claims because courts have recognized claims based on a derivative reliance theory in factually similar situations, focusing instead on the actor's degree of control in compelling reliance and the foreseeability of the injury.

IDSA relied on *Nasser v. Parker*, 455 S.E.2d 502, 503 (Va. 1995) to support its argument that Virginia would not recognize a misrepresentation claim based on derivative reliance. ROA.5303 (Dkt. No. 363, at 19). In *Nasser*, the father of a murder victim brought a wrongful death action against the psychiatrist and psychiatric hospital who were treating the assailant for failing to warn his daughter of the assailant's release from the hospital. 455 S.E.2d at 503. There, the plaintiff argued that a duty should be imposed, as articulated in Section 315 of the Restatement, "to protect one from the wrongful acts of a third party" because of a "special relationship" between the defendant and the third party. *Id*. The Virginia Supreme Court declined to impose such duty noting that in prior criminal act cases where the court imposed a duty the defendant had effectively "taken charge" of a third person and was "vested with a higher degree of control." *Id*. at 505 (discussing *Fox v. Custis,* 372 S.E.2d 373, 376 (Va. 1988) where parole officer was not liable

and distinguishing *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 401 S.E.2d 878, 883 (1991) where the OAR was).

However, *Nasser* did not consider Sections 310 or 311 of the Restatement, and it has been distinguished in factually similar cases applying Virginia law. For instance, in *Jappell v. Am. Ass'n of Blood Banks*, the court found that the plaintiff adequately pled a claim against the American Association of Blood Banks (AABB) for negligently failing to advise its member blood banks to use reasonable and available methods to screen out donor blood contaminated with HIV. 162 F. Supp. 2d 476, 481 (E.D. Va. 2001). The court noted that in determining whether a duty exists under Virginia law, the court considers factors "including foreseeability of harm, the likelihood of injury, the magnitude of the burden of guarding against that injury, and the consequences of placing such a burden on the defendant." *Id*. at 480 (internal citation omitted). The court further distinguished cases which required a showing of a special relationship because they generally involved an allegation that the defendant failed to control the criminal acts of a third party and such criminal acts "cannot reasonably be foreseen." *Id*.

The court found that such was not the case for the AABB, and therefore, the cases requiring a plaintiff to show a special relationship were not applicable. *Id*. The court accepted the plaintiff's allegation that AABB was "a standard-setter for the blood banking industry" and it had "substantial power over the operation of blood

41

banks." *Id*. Because it was the recipients of blood products, including the plaintiff, who were the ultimately beneficiaries of the standards set by the AABB, the court thus held that it was foreseeable that improper standards could lead to injury to the class of persons to which plaintiff belonged. *Id*. at 481. "When Defendant undertook to ensure the safety of the nation's blood supply by issuing standards, it took on a duty to transfusion recipients to ensure those standards were drafted without negligence." *Id*.

In reaching this holding, the *Jappell* court relied on *Snyder v. Am. Ass'n of Blood Banks*, 676 A.2d 1036 (N.J. 1996). There, the New Jersey Supreme Court similarly held that the AABB could be liable for its negligence in setting testing standards for donor blood, despite the fact that it had no immediate connection to the donor or the plaintiff. *Id*. at 1048. The court reasoned that "the absence of a contractual or special relationship [was] not dispositive;" rather, the important considerations were "the foreseeability of injury to others from the defendant's conduct," "the nature of the risk posed by the defendant's conduct," "the relationship of the parties," and "the impact on the public of the imposition of a duty of care." *Id*. (internal citations omitted). The court considered the fact that blood banks, hospitals, and patients had come to rely on the AABB for the safety of the nation's blood supply; that this responsibility was sought and cultivated by the AABB; and, that it had dominated the establishment of standards for the blood-banking industry. *Id*. "In

many respects, the AABB wrote the rules and set the standards for voluntary blood banks." *Id*.

Based on the foregoing considerations, including the severity and foreseeability of the risk that blood transfusions could spread AIDS, the court rejected the AABB's argument that it could not be found liable for taking "the wrong side of a debate involving medical uncertainties," and instead found that it did owe a duty of care to the plaintiff. *Id*. at 1049; *see also Weigand v. Univ. Hosp. of New York Univ. Med. Ctr.*, 659 N.Y.S.2d 395, 399–400 (N.Y. Sup. Ct. 1997):

> [I]t is clear that the care used in establishing those industry standards has tremendous impact on the manner in which blood is collected and tested. It is equally clear that the relationship between a standard-setting industry association and the ultimate recipient of a transfusion, although not a direct relationship, is one in which the conduct of the industry association may have a direct effect on the recipient, e.g., if the industry association negligently sets inadequate standards for blood collection and screening and those standards are followed by a member blood bank, resulting in the collection and transfusion of tainted blood, it is the recipient of the blood transfusion who will be damaged, not the blood bank.

*Id*.; *see also In re Factor VIII or IX Concentrate Blood Prod. Litig.*, 25 F. Supp. 2d 837, 839–40 (N.D. Ill. 1998)(holding that it was proper to impose liability against the National Hemophilia Foundation (NHF) for misrepresentations made in medical treatment standards and recommendations disseminated and relied upon by physicians in their treatment of people with hemophilia).

The same considerations must be applied here in determining whether the existence of a special relationship is necessary to impose liability against IDSA for its misrepresentations in the establishment of Lyme disease treatment standards. Just as the AABB and NHF established themselves as the "preeminent authority" on medical-related standards and treatment issues, so too has IDSA held itself out as the preeminent authority with regards to the acceptable treatment standards for Lyme disease. ROA.6586 (Dkt. No. 377, at ¶102). Importantly, here, Lyme doctors' reliance on the IDSA Guidelines was not only foreseeable, but it is compelled. Because the IDSA takes affirmative, egregious actions, going so far as to report doctors to state medical boards who do *not* rely on the treatment recommendations in the Guidelines, ROA.5667–5671, there is no question that the injury to Lyme patients is foreseeable where IDSA effectively compels their doctors to rely on the Guidelines' inaccurate treatment standards.

The District Court distinguished *Snyder* and *Weigand* on the basis that they did not involve misrepresentation claims.[15] However, in doing so, the District Court did not offer any analysis as to why such distinction was meaningful in determining

---

[15] The District Court also distinguished *Blood Prod. Litig.*, 25 F. Supp. 2d at 839–40 "because it involved direct reliance by the plaintiffs." *Torrey*, 2021 WL 6774574, at *6, n. 5. However, this purported distinction fails to take into account that "the primary theory of liability [was] that the NHF was negligent in providing information and advice to its members and for the benefit of the hemophilia community at large." 25 F. Supp. 2d at 839–40. "The facts of this case involve an organization supplying information to its known membership and, by extension, to the limited community of persons suffering from hemophilia." *Id.* at 845. The same is true here.

whether a duty should be imposed against an actor who makes misrepresentations, maintains effective control over the parties who are compelled to rely on those misrepresentations, and where the inaccuracy of those representations will foreseeably cause severe harm to third parties. *See Derrick v. Lincoln Nat'l Life Ins. Co.*, No. 6:18-CV-00085, 2020 WL 4352758, at *6 (W.D. Va. July 29, 2020)(internal citation omitted)(noting that "courts have held that [negligent misrepresentation] claims are nothing more than a claim of negligence.").

Additionally, courts consider the same factors in deciding whether to impose liability against trade associations in other contexts. *See e.g King v. Nat'l Spa & Pool Inst., Inc.*, 570 So. 2d 612, 616 (Ala. 1990)(holding trade association that promulgated minimum safety design standards for construction and installation of swimming pool, and disseminated those standards to its members for purpose of influencing construction and design, could be liable to downstream plaintiff injured while diving); *see also Arnstein v. Manufacturing Chemists Ass'n, Inc.,* 414 F.Supp. 12, 14 (E.D.Pa.1976) (holding liability could be imposed against chemical industry trade association, which sponsored chemical research, emphasized chemical education, and published chemical safety standards in claim brought by chemical company worker who died of cancer); *Rountree v. Ching Feng Blinds Indus. Co.*, 393 F. Supp. 2d 942, 946 (D. Alaska 2005)(holding that plaintiff established a prima

facie case against window covering trade association where it was shown that it sponsored safety standards and warnings for its members' products).

Here, regardless of which state's substantive law applies, no special relationship is required to impose liability against IDSA based on its fraudulent and negligent misrepresentations considering the degree of control it exercises over Plaintiffs' doctors to compel their reliance on the Guidelines and the foreseeability of harm Plaintiffs would endure as a result of such reliance.

### 4. Plaintiffs sufficiently pled their fraudulent and negligent misrepresentation claims with particularity as required by Rule 9(b).

Generally, Rule 9(b) does not apply to negligent misrepresentation claims. *Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668–69 (5th Cir. 2004)(" Rule 9(b)'s stringent pleading requirements should not be extended to causes of actions not enumerated therein.")(internal citation omitted). However, where there is not a separate factual focus between a plaintiff's fraud and negligent misrepresentation claims, the heightened pleading standard applies. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003).

This Court requires that fraud be plead with particularity by identifying the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)(internal citation omitted); *see also Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d

552, 564–65 (5th Cir. 2002)(a plaintiff pleading fraud must "identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."). Thus, for purposes of complying with Rule 9(b), the allegations which must be plead with particularity relate to the actor who made the fraudulent statement, not the allegations relating to the person defrauded.

Even if Virginia law applies to Plaintiffs' claims,[16] Plaintiffs have sufficiently alleged their misrepresentation claims in accordance with the heightened pleading standard. Plaintiffs' Third Amended Complaint specifically sets forth:

- the fraudulent statements (the Guidelines' promotion of the idea as a matter of scientific fact that there is no treatment failure and two-tier testing is necessary and accurate); [17]

- the identity of the speaker (IDSA);

- when and where the statements were made (in 2000 and 2006, authored in large part from the IDSA Panelist's home offices in New York, and disseminated from there to doctors across the country);[18] and,

- explained why the statements were fraudulent and what the IDSA obtained thereby (the IDSA holds itself out as the leading medical authority on treatment and diagnosis of Lyme disease, it promulgated

---

[16] Virginia requires fraud claims, whether they be characterized as actual fraud or constructive fraud (negligent misrepresentation), be plead with distinct and direct allegations since those claims are subject to the higher clear and convincing evidence burden of proof. *Derrick*, 2020 WL 4352758, at *3; *see also Sweely Holdings, LLC v. SunTrust Bank*, 820 S.E.2d 596, 604 (Va. 2018).

[17] ROA.5679–80 (Dkt. No. 377, at ¶84–87 relating to treatment failure); ROA.5677–78, 5711–13, Dkt. No. ¶78–82, 186–190 relating to testing); *see also* ROA.6002–6048.

[18] ROA.5662–5665 (Dkt. No. 377, at ¶38–49); *see also* ROA.5709–5711 (Dkt. No. 377, at ¶182–185).

treatment standards that it knew were false, and it colluded in a concerted effort that the Guidelines be treated as mandatory in exchange for consulting fees it received from insurance companies).[19]

The Third Amended Complaint also identified specific instances where Plaintiffs' doctors refused to provide them with necessary treatment as a direct result of their reliance on the Guidelines. ROA.5709–5711 (Dkt. No. 377, at ¶182–185)(describing specific experiences of Plaintiffs, Adriana Moreira and Rosetta Fuller). This is not a case where Plaintiffs simply regurgitated the elements of a cause of action without any factual basis or particularity to explain how Plaintiffs were harmed. Rather, Plaintiffs' 63-page, 206-paragraph long Third Amended Complaint sufficiently identified the fraud committed by IDSA, at the expense of Plaintiffs' health and safety and that of hundreds of other people suffering from chronic Lyme disease, in such detail which went beyond even the heightened pleading standard required by Rule 9(b).

In the alternative, if the Court finds that Plaintiffs have failed to meet Rule 9(b)'s heightened pleading requirements with regards to Plaintiffs' fraudulent misrepresentation claim, Rule 8(a)'s pleading standard should be applied to Plaintiffs' negligent misrepresentation claim because it is not "tied inextricably to an actual fraud claim." *See ZT Emp. Servs., LLC*, 2021 WL 1199579, at *3 (holding

---

[19] ROA.5708–09 (Dkt. No. 377, at ¶¶178–79); ROA.5678 (Dkt. No. 377, at ¶¶82–83); ROA.5672-5676 (Dkt. No. 377, at ¶¶ 72–77).

that 9(b) did not apply to negligence claim and denying motion to dismiss). Accordingly, at the very minimum, Plaintiffs should be permitted to proceed on their negligent misrepresentation claim because it unquestionably met the applicable pleading standard.

5. ***Plaintiffs' fraudulent and negligent misrepresentation claims are not barred by judicial estoppel.***

"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation." *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004)(internal citation omitted). Three elements must be met to invoke the doctrine of judicial estoppel: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Cox v. Richards*, 761 F. App'x 244, 246 (5th Cir. 2019). "[B]ecause judicial estoppel is designed to protect the judicial system, not the litigants, detrimental reliance by the party opponent is not required." *Superior Crewboats, Inc.*, 374 F.3d at 334 (internal citation omitted). Inadvertence can be established by showing that the party was unaware of facts giving rise to the purportedly inconsistent position, or alternatively, that they had no motive to conceal it from the court. *Allen v. C & H Distributors, L.L.C.*, 813 F.3d 566, 573 (5th Cir. 2015).

Here, judicial estoppel does not apply to Plaintiffs' personal injury claims. First, Plaintiffs took the position that they were not seeking personal injury damages

for their RICO claims;[20] however, they did not take the position that they would not seek personal injury damages for any other claims should they learn of additional facts giving rise to other claims in the future.

Second, there is no indication that the District Court "accepted" this position as there were no orders entered relating to the alleged prior position that Plaintiffs were not seeking personal injury damages for any claims. *Contra Superior Crewboats, Inc.*, 374 F.3d at 335 (holding that bankruptcy court adopted plaintiff's prior representation that no personal injury claims existed by issuing a no asset discharge order based on that representation).

Moreover, as to the third element of inadvertence, there is nothing in the record to show that Plaintiffs were aware of facts which were sufficient to give rise to the misrepresentation claims when they claimed they were not seeking personal injury damages for their RICO claims. Plaintiffs did not have sufficient evidence to overcome the pleading requirements of the misrepresentation claims until they took the depositions of Dr. Wormser, Dr. Sigal, Dr. Shapiro, and Christopher Busky. *See* ROA.5973. All of these depositions occurred at the end of 2020 and the beginning of 2021. Plaintiffs then promptly amended their Complaint to include the misrepresentation claims once they were armed with sufficient facts to allege that IDSA knew the representations in the Guidelines were false and that doctors across

---

[20] ROA.865.

the country relied on them, yet it repeatedly touted the accuracy of its treatment standards and continued to enforce them as mandatory. *See e.g.* ROA.4861 (Plaintiff's Second Amended Complaint filed on January 7, 2021); *see also Arkansas v. Wilmington Tr. Nat'l Ass'n*, No. 3:18-CV-1481-L, 2020 WL 1249570, at *7 (N.D. Tex. Mar. 16, 2020)(refusing to dismiss plaintiff's declaratory judgment claim on basis that defendants failed to satisfy third element of judicial estoppel defense where it was unclear from the pleadings when plaintiff had sufficient knowledge of facts to support claim).

Based on the foregoing, Plaintiffs' misrepresentation claims are not barred by judicial estoppel.

### 6. Plaintiffs' misrepresentation claims should not be struck as untimely because they were filed within the pleadings deadline.

The District Court's Amended Docket Control Order set the deadline to amend pleadings as April 16, 2021 and specifically provided that it was "not necessary to file a Motion for Leave to Amend" before that deadline. ROA.4731. Plaintiffs filed their Third Amended Complaint on February 4, 2021, over two months before the pleadings deadline and nearly eight months before the September 27, 2021 trial setting.[21]

---

[21] *See supra* at 18 (Plaintiffs' Third Amended Complaint was filed under seal at Dkt. No. 361 and therefore, does not appear in the EROA. The same pleading appears in the EROA at Dkt. No. 377).

To the extent IDSA argues that it will suffer prejudice because the amendment was made after the DCO's deadline for fact discovery, Plaintiffs offered to make themselves available for additional depositions beyond the deadline and to limit the amount of fact discovery needed to alleviate any disruption in the existing trial schedule. ROA.5975.

Based on the foregoing, there is no basis for striking Plaintiffs' fraudulent and negligent misrepresentation claims as untimely.

## C. Because IDSA should not have prevailed, the District Court erred by granting IDSA's bill of costs.

Federal Rule of Civil Procedure 54(d) permits the award of costs, other than attorney's fees, to the prevailing party. Fed. R. Civ. P. 54(d)(1). Pursuant to this Rule, the District Court's Local Rule and Standing Order, and 28 U.S.C. § 1920, IDSA sought the entry of a bill of costs in its favor and against Plaintiffs in the amount of $43,940.06. ROA.6442. The District Court entered an Order granting IDSA's requested bill of costs. ROA.6499–6501.

Because Plaintiff's misrepresentation claims should have survived IDSA's Motion to Dismiss for the reasons explained above, IDSA should not have prevailed. Accordingly, to the extent this Court finds the District Court erred in dismissing Plaintiffs' misrepresentation claims, Plaintiffs similarly seek a reversal of the Order granting IDSA's Motion for Entry of its Bill of Costs.

## CONCLUSION

The District Court's Orders dismissing Plaintiffs' misrepresentation claims and granting IDSA its bill of costs should be reversed.

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, L.L.P.

*/s/ Daniel R. Dutko*
Daniel R. Dutko
State Bar No. 24054206
ddutko@rustyhardin.com
Kendall Valenti Speer
State Bar No. 24077954
kspeer@rustyhardin.com

5 Houston Center
1401 McKinney Street, Suite 2250
Houston, Texas 77010
(713) 652-9000 Phone
(713) 586-3826 Direct

**COUNSEL FOR APPELLANTS**

**CERTIFICATE OF SERVICE**

I certify that on February 8, 2023, the foregoing document was served, via the

Court's CM/ECF Document Filing System, upon the following registered CM/ECF

users:

Alvin B. Dunn
1200 Seventeenth Street, NW
Washington, DC 20036
Phone (202) 663-8000
Facsimile (202) 663-8007
alvin.dunn@pillsburylaw.com

By:  _/s/ *Daniel R. Dutko*_
     Daniel R. Dutko

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,760 words, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 5th CIR. R. 32.1.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt. Times New Roman font.

3.      It is understood that a material misrepresentation in this certificate may result in the striking of this brief and imposition of sanctions against the undersigned.


By:   */s/ Daniel R. Dutko*     
             Daniel R. Dutko