No. 22-40728

## UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

### LISA TORREY, ET AL.,

*Plaintiffs-Appellants*

*v.*

### INFECTIOUS DISEASES SOCIETY OF AMERICA,

*Defendant-Appellee*

Appeal from the United States District Court for the
Eastern District of Texas
Case No. 5:17-cv-190-RWS

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF OF THE COUNCIL OF MEDICAL SPECIALTY SOCIETIES, SUPPORTED BY 26 OF ITS MEMBER SOCIETIES, IN SUPPORT OF AFFIRMANCE

The Council of Medical Specialty Societies, supported by
contributions from 26 of its member societies, hereby moves for leave to
file an amici curiae brief in support of affirmance of the district court's
decision below. Fed. R. App. P. 29(a)(3.)

The Council, which includes 50 specialty societies that represent
more than 800,000 physicians, is interested in this appeal because of

the critical importance of medical guidelines to the dissemination and advancement of medical science. Almost all of the Council's member societies produce clinical guidelines. *See, e.g.*, https://www.guidelinecentral.com/guidelines/ (select "By Organization," and view the pull-down menu, which shows in parentheses the number of guidelines available for a given organization, including many of the Council's member societies). Medical guidelines disseminate knowledge to help medical practitioners know how to best treat their patients. *See* https://cmss.org/value-of-scholarly-publishers/. Further, medical guidelines, much like articles in scholarly journals, are an important part of the scientific discourse by which physicians around the world exchange ideas. As a result, the Council is interested in protecting the free exchange of ideas through scientific papers, including medical guidelines and journal articles, so that its members can continue to pursue the advancement of safe and effective medicine.

Given this interest, the Council supports the holding of the district court—that "where there is a legitimate difference of opinion on medical treatments among experts, there is no false representation of material fact." ROA.6419.

The Council believes that this brief will assist the Court by highlighting the important First Amendment principles at stake in this case. For example, the brief explains that the First Amendment protects debate about scientific conclusions and that this protection of scientific opinions, which are always subject to revision, is essential to the development of safe and effective medicine. The brief also explains how the context of a statement being in medical guidelines affects the First Amendment analysis. And the brief also notes that treating medical opinions expressed in clinical practice guidelines as statements of fact, rather than as nonactionable opinions, would chill the development of future guidelines and thus reduce the quality of care that physicians are able to provide to their patients.

The Council's undersigned attorney has contacted the parties to notify them of its intent to file this motion. Counsel for the Infectious Diseases Society of America does not oppose this motion; counsel for the appellants did not respond to the undersigned's requests for consent. *See* 5th Cir. R. 27.4.

## CONCLUSION

For these reasons, this Court should grant the motion for leave to file the amicus brief.

Respectfully submitted,

Dated:  April 17, 2023

By  s/ Aaron D. Lindstrom

AARON D. LINDSTROM (P72916)
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*Counsel for Amicus Curiae*
COUNCIL OF MEDICAL SPECIALTY
SOCIETIES

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, I electronically filed the foregoing **Motion for Leave to File Amicus Curiae Brief** with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_/s/   Aaron D. Lindstrom_

No. 22-40728

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### LISA TORREY, ET AL.,

*Plaintiffs-Appellants*

*v.*

### INFECTIOUS DISEASES SOCIETY OF AMERICA,

*Defendant-Appellee*

Appeal from the United States District Court for the
Eastern District of Texas
Case No. 5:17-cv-190-RWS

### AMICUS CURIAE BRIEF OF
### THE COUNCIL OF MEDICAL SPECIALTY SOCIETIES,
### SUPPORTED BY 26 OF ITS MEMBER SOCIETIES,
### IN SUPPORT OF AFFIRMANCE

AARON D. LINDSTROM (P72916)
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*Counsel for Amicus Curiae,*
*COUNCIL OF MEDICAL SPECIALTY SOCIETIES*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 28.2 of the Fifth Circuit Rules, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants:**

> Lisa Torrey
> Kathryn Kocurek, individually & on behalf of the estate of J.
>     David Kocurek, Ph.D.
> Amy Hanneken
> Jane Powell
> Carol Fisch
> John Valerio, individually and as next friend of Christopher
>     Valerio
> Randy Sykes
> Brienna Reed
> Rosetta Fuller
> Adriana Monteiro Moreira
> Jessica McKinnie
> Kristine Woodard
> Gayle Clarke
> Allison Lynn Caruana
> Chloe Lohmeyer
> Tawnya Dawn Smith, individually and as next friend of Monet
>     Pitre
> Mike Peacher, individually and as next friend of Ashleigh Peacher
> Alarie Bowerman, individually and as next friend of Elisa
>     Bowerman, Emory Bowerman, and Anais Bowerman

**Attorneys for Plaintiffs-Appellants:**

Daniel R. Dutko
Kendall Valenti Speer
Rusty Hardin & Associates, LLP
Ryan Higgins
Rusty Hardin & Associates, LLP
Eugene Egdorf
Daniels & Tredennick, PLLC
Lance Lee

**Defendant-Appellee:**

Infectious Diseases Society of America

**Attorneys for Defendant-Appellee:**

Alvin Dunn
Michael A. Warley
Ronald Casey Low
Pillsbury Winthrop Shaw Pittman LLP

**Guardian Ad Litem:**

George Matteson
Moore, Giles & Matteson, LLP

**Amicus curiae**

Council of Medical Specialty Societies
American Academy of Dermatology
American Academy of Ophthalmology
American Academy of Physical Medicine and Rehabilitation
American Association for the Study of Liver Diseases
American College of Chest Physicians
American College of Emergency Physicians
American College of Obstetricians and Gynecologists
American College of Physicians

American College of Radiology
American Epilepsy Society
American Gastroenterological Association
American Geriatrics Society
American Society for Clinical Pathology
American Society for Reproductive Medicine
American Society of Anesthesiologists
American Society of Clinical Oncology
American Society of Hematology
American Society of Nephrology
American Thoracic Society
American Urological Association
North American Spine Society
Society for Vascular Surgery
Society of General Internal Medicine
Society of Hospital Medicine
Society of Interventional Radiology
Society of Thoracic Surgeons

**Attorneys for amicus curiae**

Aaron D. Lindstrom
Barnes & Thornburg LLP

The Council of Medical Specialty Societies has no parent

corporation and is not publicly traded. The Council is not aware of any

publicly owned corporation not a party to the appeal that has a

financial interest in the outcome of the litigation.

<u>s/ Aaron D. Lindstrom</u>

Dated: April 17, 2023

# TABLE OF CONTENTS

**Page**

Certificate of interested persons ............................................................ 2

Table of authorities ...................................................................... ii

Statement of amicus curiae.................................................................... 1

Argument......................................................................................... 4

I.    The district court's rule correctly advances First Amendment
principles. ...................................................................................... 4

    A.    The standard of review is de novo. ...................................... 4

    B.    First Amendment protection for debate about scientific
conclusions is essential to the development of safe and
effective medicine. .................................................................. 4

    C.    In the context of clinical guidelines, the reader
understands that the statements are medical opinions
based on judgments and interpretations of the relevant
underlying studies............................................................... 15

    D.    Holding physicians liable for producing clinical
guidelines would chill the dissemination of current
medical knowledge. ............................................................. 19

Conclusion ...................................................................................... 22

Certificate of compliance...................................................................... 24

Certificate of Service ............................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Abood v. Detroit Bd. of Ed.,*
  431 U.S. 209 (1977) ................................................................. 5

*Abrams v. United States,*
  250 U.S. 616 (1919) ................................................................. 5

*Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.,*
  No. SACV140248AGANX, 2014 WL 12579802 (C.D. Cal. June 4,
  2014) .................................................................................... 18

*City of San Diego, Cal. v. Roe,*
  543 U.S. 77 (2004) ................................................................... 5

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993) .......................................................... 7, 16

*Eastman Chemical Co. v. Plastipure, Inc.,*
  775 (5th Cir. 2014) ................................................................ 15

*Ezrailson v. Rohrich,*
  65 S.W.3d 373 (Tex. App. 2001) ..................................... 19, 20

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
  138 S. Ct. 2448 (2018) ............................................................. 5

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.,*
  385 U.S. 589 (1967) ................................................................. 6

*Meador v. Apple, Inc.,*
  911 F.3d 260 (5th Cir. 2018) .................................................. 4

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ................................................................. 5

*ONY, Inc. v. Cornerstone Therapeutics, Inc.,*
  720 F.3d 490 (2d Cir. 2013) ......................................... passim

*Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*,
   63 F.4th 240 (3d Cir. Mar. 24, 2023) ........................................... passim

*Redco Corp. v. CBS, Inc.*,
   758 F.2d 970 (3d Cir. 1985) ................................................................ 17

*Saad v. Am. Diabetes Ass'n*,
   123 F. Supp. 3d 175 (D. Mass. 2015) ................................................. 18

*TMJ Implants, Inc. v. Aetna, Inc.*,
   498 F.3d 1175 (10th Cir. 2007) ............................................................ 6

*United States v. Alvarez*,
   567 U.S. 709 (2012) .............................................................................. 5

*Urofsky v. Gilmore*,
   216 F.3d 401 (4th Cir. 2000) ................................................................ 6

## OTHER AUTHORITIES

A. Berg et al., *Clinical Practice Guidelines in Practice and Education*,
   12 (Suppl. 2) Journal of General Internal Medicine S25 (Apr. 1997)
   .................................................................................................. 10, 21

B. Fervers et al., *Clinical Practice Guidelines*,
   147(6) Journal of Visceral Surgery e341 (Dec. 2010) ........................... 8

D. Cameron et al., *Evidence Assessments and Guideline
   Recommendations in Lyme Disease: The Clinical Management of
   Known Tick Bites, Erythema Migrans Rashes and Persistent Disease*,
   12(9) Expert Review of Anti-Infective Therapy 1103 (2014) ............. 13

E. Chan, *The "Brave New World" of Daubert: True Peer Review,
   Editorial Peer Review, and Scientific Validity*, 70 N.Y.U. L. Rev. 100
   (1995) .................................................................................................. 10, 11

Institute of Medicine (US) Committee on Standards for Developing
   Trustworthy Clinical Practice Guidelines,
   *Clinical Practice Guidelines We Can Trust* (Nat'l Acad. Press,
   Washington, DC 2011) ........................................................................... 8

J. Pencharz et al., *A Critical Appraisal of Clinical Practice Guidelines for the Treatment of Lower-Limb Osteoarthritis*,
4(1) Arthritis Research & Therapy 36 (Oct. 16, 2001) ........................ 12

M. Pletz, *International Perspective on the New 2019 American Thoracic Society/Infectious Diseases Society of America Community-Acquired Pneumonia Guideline*,
158(5) Chest 1912 (Nov. 2020) ............................................................. 12

M.J. Field & K. N. Lorh,
*Clinical Practice Guidelines* (Nat'l Acad. Press, Washington, DC 1992) ................................................................................................ 6, 7

O. Okobi, *A Review of Four Practice Guidelines of Inflammatory Bowel Disease*,
13(8) Cureus e16859 (Aug. 2021) ........................................................ 12

P.R. Farrell et al., *Ancient Texts to PubMed: A Brief History of the Peer-Review Process*,
37 Journal of Perinatology 13 (2017) ..................................................... 9

T. Fuller et al., *Different Teams, Same Conclusions? A Systematic Review of Existing Clinical Guidelines for the Assessment and Treatment of Tinnitus in Adults*,
8(206) Frontiers in Psychology 1 (Feb. 22, 2017) ................................ 12

## STATEMENT OF AMICUS CURIAE

Founded more than 50 years ago, the Council of Medical Specialty Societies provides an independent forum for medical specialty societies to discuss issues of national interest and mutual concern. Over the years, the Council has grown to now include 50 specialty societies that represent more than 800,000 physicians. A full list of its member societies is available at https://cmss.org/membership/societies/.

The Council is interested in the issues presented in this appeal because of the critical importance of medical guidelines to the dissemination and advancement of medical science. Almost all of the Council's member societies produce clinical guidelines. *See, e.g.*, https://www.guidelinecentral.com/guidelines/ (select "By Organization," and view the pull-down menu, which shows in parentheses the number of guidelines available for a given organization, including many of the Council's member societies). Medical guidelines disseminate knowledge to help medical practitioners know how to best treat their patients. *See* https://cmss.org/value-of-scholarly-publishers/. Further, medical guidelines, much like articles in scholarly journals, are an important part of the scientific discourse by which physicians around the world

1

exchange ideas. As a result, the Council is interested in protecting the free exchange of ideas through scientific papers, including medical guidelines and journal articles, so that its members can continue to pursue the advancement of safe and effective medicine. For example, the Council recently presented an amicus brief to the Third Circuit, in *Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*, 63 F.4th 240 (3d Cir. Mar. 24, 2023), to explain why statements made in scholarly articles in medical journals should be considered statements of medical opinion, not of fact.

As the district court here correctly observed, medical guidelines are "medical opinions" that "set forth explanations of medical research, experiments and knowledge based on citations to other published studies and clinical trials," and are "not naked assertions of fact." ROA.6419. Medical guidelines rest on the premise that science advances through continuous testing and is always open to revision, and thus the Council supports the holding of the district court—that "where there is a legitimate difference of opinion on medical treatments among experts, there is no false representation of material fact." ROA.6419.

2

The Council has moved for leave to file this brief. Only its counsel authored any part of the brief. Only the Council and its members—i.e., no party, party's counsel, other individual, or other organization— contributed financial support intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(D–E). Specifically, the following 26 Council member societies provided financial support for this brief:

1. American Academy of Dermatology
2. American Academy of Ophthalmology
3. American Academy of Physical Medicine and Rehabilitation
4. American Association for the Study of Liver Diseases
5. American College of Chest Physicians
6. American College of Emergency Physicians
7. American College of Obstetricians and Gynecologists
8. American College of Physicians
9. American College of Radiology
10. American Epilepsy Society
11. American Gastroenterological Association
12. American Geriatrics Society
13. American Society for Clinical Pathology
14. American Society for Reproductive Medicine
15. American Society of Anesthesiologists
16. American Society of Clinical Oncology

17.    American Society of Hematology

18.    American Society of Nephrology

19.    American Thoracic Society

20.    American Urological Association

21.    North American Spine Society

22.    Society for Vascular Surgery

23.    Society of General Internal Medicine

24.    Society of Hospital Medicine

25.    Society of Interventional Radiology

26.    Society of Thoracic Surgeons

# ARGUMENT

## I.    The district court's rule correctly advances First Amendment principles.

### A.    The standard of review is de novo.

This Court "review[s] the grant of a motion to dismiss under Rule

12(b)(6) de novo, 'accepting all well-pleaded facts as true and viewing

those facts in the light most favorable to the plaintiffs.'" *Meador v.*

*Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018).

### B.    First Amendment protection for debate about scientific conclusions is essential to the development of safe and effective medicine.

Our country has "a profound national commitment to the principle

that debate on public issues should be uninhibited, robust, and wide-

open . . . ." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Indeed, "[t]he theory of our Constitution is 'that the best test of truth is

the power of the thought to get itself accepted in the competition of the

market[.]'" *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (quoting

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J.,

dissenting)).

This principle of promoting open debate in a marketplace of ideas

is not limited to discussion of governmental affairs. *Abood v. Detroit Bd.*

*of Ed.*, 431 U.S. 209, 231 (1977) ("[O]ur cases have never suggested that

expression about philosophical, social, artistic, economic, literary, or

ethical matters to take a nonexhaustive list of labels is not entitled to

full First Amendment protection."), rev'd on other grounds by *Janus v.*

*Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448

(2018). Rather, it extends to debates about issues of public concern, and

in the First Amendment context, "public concern is something that is a

subject of legitimate news interest; that is, a subject of general interest

and of value and concern to the public at the time of publication." *City*

*of San Diego, Cal. v. Roe*, 543 U.S. 77, 83–84 (2004).

Information about medical treatments is a matter of public concern. *See, e.g.*, *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1185–86 (10th Cir. 2007) (holding that the effectiveness of prosthetic implants was a matter of public concern because "thousands of people . . . have a legitimate interest in the utility of [the] devices"); *Urofsky v. Gilmore*, 216 F.3d 401, 430 (4th Cir. 2000) (Wilkinson, C.J., concurring in judgment) ("Speech in the social and physical sciences, the learned professions, and the humanities is central to our democratic discourse and social progress."). Indeed, "academic freedom" is "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967).

Clinical guidelines are part of the public debate about medical science. Clinical guidelines are "systematically developed statements to assist practitioner and patient decisions about appropriate health care for specific clinical circumstances." M.J. Field & K. N. Lorh, *Clinical Practice Guidelines* at 8 (Nat'l Acad. Press, Washington, DC 1992). According to the National Institutes of Health, clinical guidelines "contain recommendations that are based on evidence from a rigorous systematic review and synthesis of the published medical literature."

Https://www.nccih.nih.gov/health/providers/clinicalpractice. "These
guidelines are not fixed protocols that must be followed, but are
intended for health care professionals and providers to consider." *Id.*
"While they identify and describe generally recommended courses of
intervention, they are not presented as a substitute for the advice of a
physician or other knowledgeable health care professional or provider."
*Id.*

Producing clinical guidelines involves a cycle of "three basic
stages: development, intervention, and evaluation." Field, *Clinical
Practice Guidelines* at 3. The latter two stages "involve feedback loops to
the first stage to prompt the revision of guidelines when omissions,
technical obsolescence, or other problems with a set of guidelines are
identified." *Id.* "Guidelines are thus dynamic, not static," and "reflect
the interplay of scientific and technological progress, real-world
organizational pressures, and changes in social values." *Id.*  In other
words, the scientific community recognizes, just as the U.S. Supreme
Court has, that "[s]cientific conclusions are subject to perpetual
revision." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597
(1993).

7

Clinical guidelines produced by medical societies are scientific papers, sometimes published as separate documents and sometimes published in medical journals. B. Fervers et al., *Clinical Practice Guidelines*, 147(6) Journal of Visceral Surgery e341, e345 (Dec. 2010) (discussing the diffusion of clinical practice guidelines both on the internet and by "publication in a specialized medical journal"). Physicians have created thousands of clinical guidelines, and these guidelines are available through resources such as PubMed. *See* Institute of Medicine (US) Committee on Standards for Developing Trustworthy Clinical Practice Guidelines, *Clinical Practice Guidelines We Can Trust* (Nat'l Acad. Press, Washington, DC 2011) ("Clinical practice guidelines now are ubiquitous in our healthcare system. The Guidelines International Network (GIN) database currently lists more than 3,700 guidelines from 39 countries."); *see also* https://pubmed.ncbi.nlm.nih.gov/. Clinical guidelines are frequently discussed, evaluated, and critiqued in articles in scholarly journals and thus are part of the scientific debate.

The fact that guidelines are subject to ongoing debate is significant and highlights that their contents are not simple assertions

8

of fact, but rather are medical opinions drawn from an examination of the available evidence. Indeed, these guidelines and the medical journals that review and critique them are the modern equivalent of the public square; in the modern world, scientific journals are the central forum where the debate about medical science occurs.

Part of the debate occurs before publication. For guidelines that are published in peer-reviewed journals, the debate includes dialog between the authors who submit an article and the external peer reviewers who review the submission to see if it follows the scientific process and reaches scientifically sound conclusions. Pre-publication peer review dates back to at least 1752, when "the Royal Society of London required all submissions to be reviewed by a council of experts prior to publication." P.R. Farrell et al., *Ancient Texts to PubMed: A Brief History of the Peer-Review Process*, 37 Journal of Perinatology 13, 14 (2017). Over time, more journals began using external peer review, and today independent peer review is the standard: "[f]ormalized, invited external peer review is now considered a fundamental tenet of modern scientific literature," *id.* at 13. Further, many guidelines not published in journals also undergo external review as scientific papers.

9

Fervers, *Clinical Practice Guidelines* at e344 (discussing external review of guidelines and describing it as "widely used today"); A. Berg et al., *Clinical Practice Guidelines in Practice and Education*, 12 (Suppl. 2) Journal of General Internal Medicine S25 (Apr. 1997) ("The final component necessary to ensure the reliability of clinical guidelines is peer review from a range of outside reviewers, including content experts, representatives of professional societies, government organizations and consumer groups, and potential guideline users.").

Another, perhaps even more important, part of the debate occurs after publication, when other interested scientists and doctors read the articles and test the theories and conclusions advanced in the articles. This creates "a global scientific discourse that is played out on the pages of the published scientific journals." E. Chan, *The "Brave New World" of Daubert: True Peer Review, Editorial Peer Review, and Scientific Validity*, 70 N.Y.U. L. Rev. 100, 113 (1995). "The body of published scientific literature is the most visible and prevalent forum through which modern-day scientific claims are communicated to the global audience of scientists." *Id.* The published articles fuel the cycle of scientific discourse: "once a claim is disseminated through publication

in journals, another scientist will test the published scientific claim and then publish the results of this testing," which in turn generates further testing and publication. *Id.* As a result, "[t]he closest approximation to a repository of scientific progress is the collective body of published scientific literature." *Id.* at 115.

This cycle of scientific discourse is important because, as other courts have recognized, "[t]he peer-review process—not a courtroom— thus provides the best mechanism for resolving scientific uncertainties." *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 658 (D.N.J. 2022), *aff'd*, 63 F.4th 240 (3d Cir. 2023); *accord ONY*, 720 F.3d at 497) (observing that scientific conclusions in journals are "available to other scientists who may respond by attempting to replicate the described experiments, conducting their own experiments, or analyzing or refuting the soundness of the experimental design or the validity of the inferences drawn from the results").

This cycle routinely includes articles in scientific journals that evaluate and critique clinical guidelines. Numerous examples of this may be found on PubMed. *E.g.*, O. Okobi, *A Review of Four Practice Guidelines of Inflammatory Bowel Disease*, 13(8) Cureus e16859 (Aug.

11

2021) ("This review evaluates four evidence-based guidelines in the management of IBD and seeks to highlight the differences and similarities between them."); T. Fuller et al., *Different Teams, Same Conclusions? A Systematic Review of Existing Clinical Guidelines for the Assessment and Treatment of Tinnitus in Adults*, 8(206) Frontiers in Psychology 1 (Feb. 22, 2017) (comparing and evaluating five clinical guidelines for treating tinnitus); J. Pencharz et al., *A Critical Appraisal of Clinical Practice Guidelines for the Treatment of Lower-Limb Osteoarthritis*, 4(1) Arthritis Research & Therapy 36 (Oct. 16, 2001) (addressing "conflicting treatment recommendations" found in six separate guidelines for treating lower-limb osteoarthritis). In fact, guidelines produced by the Infectious Diseases Society of America, the appellee in this case, have been evaluated as a part of this scientific debate. *E.g.*, M. Pletz, *International Perspective on the New 2019 American Thoracic Society/Infectious Diseases Society of America Community-Acquired Pneumonia Guideline*, 158(5) Chest 1912 (Nov. 2020).

The proper forum for resolving the scientific debate about how to treat Lyme disease is not a courtroom. If there are any scientific

weaknesses in the IDSA guidelines on Lyme disease at issue in this

case, ample avenues exist for counter-speech to challenge those medical

opinions. And, in fact, that counter-speech has occurred on this very

issue. Another medical society, the International Lyme and Associated

Diseases Society (ILADS), which the plaintiffs cite in their complaint

(ROA.5691 ¶ 113), has published competing guidelines. *See* D. Cameron

et al., *Evidence Assessments and Guideline Recommendations in Lyme

Disease: The Clinical Management of Known Tick Bites, Erythema

Migrans Rashes and Persistent Disease*, 12(9) Expert Review of Anti-

Infective Therapy 1103–35 (2014). In contrast to the guidelines at issue

in this appeal, the ILADS guidelines assert that for "patients with

persistent manifestations of Lyme disease," "antibiotic retreatment will

prove to be appropriate for the majority of patients who remain ill." *Id.*

at 1109 (Question 3 and Recommendation 3b).

The plaintiffs here are asking the federal courts to resolve this

debate between the competing guidelines and their views on the efficacy

of long-term antibiotic treatment for Lyme disease. In a case where the

"[p]laintiffs do not allege that the studies cited by the IDSA Guidelines

do not contain the findings described therein," ROA.6420, the plaintiffs

are asking federal courts to second-guess the medical judgment of the physicians who authored the IDSA guidelines—physicians who have undergone medical training, who have reviewed the sources cited in the 405 footnotes of the IDSA guidelines, and who have applied their judgment to interpret those studies. The plaintiffs are asking courts to instead adopt a medical judgment that they would prefer—a judgment more in line with the physicians who authored the ILADS guidelines (which also are supported by numerous studies, as documented in its 213 footnotes). But as the Second Court recognized, "[n]eedless to say, courts are ill-equipped to undertake to referee such controversies." *ONY*, 720 F.3d at 497 ). "Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury."

This Court should resist this request to attempt to sit as a board of medical review and instead should acknowledge, as the district court did, that "where there is a legitimate difference of opinion on medical treatments, there is no false representation of a material fact." ROA.6419.

**C.    In the context of clinical guidelines, the reader understands that the statements are medical opinions based on judgments and interpretations of the relevant underlying studies.**

The scientific context surrounding statements made in clinical guidelines is significant not just because the First Amendment protects the free marketplace of ideas, including scientific debate. This context is also significant because it affects how the reader understands the statements at issue, and it affects the type of supporting data that is included with the statement (i.e., data that allows the reader to test the conclusions). Indeed, these contextual differences are precisely what led to different outcomes between, on the one hand, the Second Circuit's decision in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013) and the Third Circuit's decision in *Pacira*, 63 F.4th 240 (3d Cir. 2023), and, on the other hand, this Court's decision in *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230 (5th Cir. 2014).

In *ONY*, the Second Circuit considered a falsity claim in the context of "[s]cientific academic discourse" occurring in an article "in a peer-reviewed journal." 720 F.3d at 496, 494. The Second Circuit noted that such articles are "directed to the relevant scientific community" "as part of an ongoing scientific discourse," and so are "understood by the

15

relevant scientific communities" as being statements of "contestable scientific hypotheses" that are "more closely akin to matters of opinion" than of fact. *Id.* at 496–97. In the context of journals engaging in the scientific method, the readers understand that "the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation." *Id.*  at 496; *accord Daubert* 509 U.S. at 597 ("Scientific conclusions are subject to perpetual revision."). Further, statements in scientific journals (unlike statements in other contexts, such as magazines) are supported by "data presented in the article" itself. *Id.* at 497. As a result, the Second Circuit held "that, as a matter of law, statements of scientific conclusions about unsettled matters of scientific debate cannot give rise to liability for damages sounding in defamation." *Id.* at 492.

Similarly, in *Pacira*, the Third Circuit analyzed statements made in a peer-reviewed academic journal. 63 F.4th at 243. The Third Circuit recognized that the statements at issue contained disclosures about limitations that made it "clear the statements here are tentative scientific conclusions subject to revision." *Id.* at 247. The Third Circuit

further emphasized the importance of context by stating that "[w]hile statements are not protected solely because they appear in a peer-reviewed journal, such journals are often 'directed to the relevant scientific community.'" *Id.* at 248 (quoting *ONY*, 720 F.3d at 496–97). "Their readers are specialists in their fields and are best positioned to identify opinions and 'choose to accept or reject [them] on the basis of an independent evaluation of the facts.'" *Id.* (quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (alteration in *Pacira*)); *accord* ROA.6420 (district court noting that "Plaintiffs' doctors were equally capable of reviewing the studies and papers cited as the basis for the opinions expressed in the IDSA Guidelines"). Indeed, "the journal's readers were provided the basis for the statements, have the expertise to assess their merits based on the disclosed data and methodology, and thus are equipped to evaluate the opinions the authors reached." *Pacira*, 63 F.4th at 249.

In contrast, when confronted with a commercial advertisement, this Circuit reached a different outcome precisely because the context was different. In *Eastman*, this Circuit distinguished *ONY* because *ONY* involved "statements made within the academic literature and

17

directed at the scientific community," and observed that "[i]n that context, the Second Circuit concluded that the defendants' statements should be treated as opinions, else the prospect of defamation liability would stifle academic debate and trench upon First Amendment values." 775 F.3d at 236. In contrast, in the case before this Circuit, "Eastman did not sue Appellants for publishing an article in a scientific journal," but rather "sought to enjoin statements made in commercial advertisements and directed at customers." *Id.* In short, context was the dispositive difference.

Consistent with the reasoning of both this Circuit and the Second and Third Circuits, a number of other courts have also concluded that statements made in the specific context of academic literature should be treated as matters of opinion, not fact. *E.g.*, *Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*, No. SACV140248AGANX, 2014 WL 12579802, (C.D. Cal. June 4, 2014) ("attacking the validity of experiments and conclusions published in peer-reviewed scientific journal articles is better done in the scientific, not legal, realm"); *Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 179 (D. Mass. 2015) (concluding that "the ADA's Expression of Concern, which was

published in a medical journal 'to alert readers to questions about the reliability of data' in four specific articles" was not actionable given "the context in which it was issued: ongoing scientific discourse"); *Ezrailson v. Rohrich*, 65 S.W.3d 373, 375 (Tex. App. 2001) (concluding that "the medical science research article is not reasonably capable of a defamatory meaning" because "opinions" on "a matter of public health and medicine" "must be protected").

As these courts understood, in the context of an academic article, the reader understands that scientific conclusions are matters of opinion, not of fact, because scientific conclusions are always subject to revision and are based on inferences drawn from the supporting data that readers may examine themselves.

### D. Holding physicians liable for producing clinical guidelines would chill the dissemination of current medical knowledge.

As explained above, scientific papers like the guidelines at issue here are where medical knowledge is developed and disseminated. This Court therefore should be wary of the chilling effect that would deter the creation of clinical guidelines if their authors are subjected to

misrepresentation claims simply because there is disagreement about the medical conclusions that the guidelines reach.

The Third Circuit emphasized this point in its recent decision: while "Pacira's critiques about the Articles' data and methodology may be the basis of future scholarly debate," they could not be considered statements of fact because "[t]o conclude otherwise would risk 'chilling' the natural development of scientific research and discourse." 63 F.4th at 248. Similarly, as the Texas Court of Appeals observed in *Ezrailson*, "in the area of medical science research, criticism of the creative research ideas of other medical scientists should not be restrained by fear of a defamation claim in the event the criticism itself also ultimately fails for lack of merit," and "calling the medical science research article here defamatory would serve to unduly restrict the free flow of ideas essential to medical science discourse." 65 S.W.3d at 382. This reasoning applies with equal force to clinical guidelines, as they too are based on scientific research and express medical opinions.

If physicians are held liable for medical opinions expressed in clinical guidelines, then there is a real risk that they might be deterred from sharing with the rest of the medical community their opinions

about how to best treat patients. Not only would this chilling effect
impede scientific discourse and progress, it could also cause real-world
harm, such as making it less likely that doctors or scientists might
create clinical guidelines in the first place or update them as scientific
developments warrant. A decrease in the availability of clinical
guidelines would make it even more difficult for physicians to keep
current on medical best practices: "the physician's ability to keep up
with the medical literature erodes with each year's burden of (literally)
millions of medical articles published worldwide, leading to interest in
methods that make sense out of the vast amount of information on a
given clinical topic." Berg, *Clinical Practice Guidelines in Practice and
Education*, 12 (Suppl. 2) Journal of General Internal Medicine at S25.
Yet if medical societies and physicians will be held liable for differences
of opinion about how to interpret research and studies about treatment
options, they are likely to stop shouldering this burden of conducting
systemic reviews of the medical literature that are designed to make
sense out of that mountain of information. In the long run, it will be
patients who suffer; with fewer guidelines available, the quality of care
patients receive may be limited to their particular doctor's knowledge of

the literature. If recommendations in clinical guidelines are treated as statements of fact, then physicians will produce fewer clinical guidelines that marshal the literature in one place and assist the physician by providing a comprehensive review of the literature.

Further, the threat of lawsuits attacking clinical guidelines extends beyond particular plaintiffs who think insurance should cover a particular treatment. If recommendations in clinical practice guidelines about particular treatments or particular drugs can be challenged as factually false even without identifying any misstatement about the underlying medical studies, then other interested parties that want to provide services that a particular set of guidelines disfavor—parties such as drug manufacturers or non-physicians—could also bring suits like this one. And this may also contribute to an overall chilling effect and deprive patients of the better treatment that results from the development of clinical guidelines.

## CONCLUSION

In the end, the district court was correct when it observed that "where there is a legitimate difference of opinion on medical treatments among experts, there is no false representation of a material fact."

ROA.6419. For these reasons, this Court should affirm the district

court's ruling.

Respectfully submitted,

Dated:  April 17, 2023          By   s/ Aaron D. Lindstrom

AARON D. LINDSTROM (P72916)
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*Counsel for Amicus Curiae*
*COUNCIL OF MEDICAL SPECIALTY*
*SOCIETIES*

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), the attached amicus curiae brief is proportionately spaced, has a typeface of 14 points or more and contains 4,122 words.

Dated:  April 17, 2023          By  s/ Aaron D. Lindstrom

AARON D. LINDSTROM (P72916)
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*Counsel for Amicus Curiae*
*COUNCIL OF MEDICAL SPECIALTY*
*SOCIETIES*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, I electronically filed the foregoing **Amicus Curiae Brief** with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_/s/   Aaron D. Lindstrom_